# SHAFFER ET AL. *v.* HEITNER

No. 75–1812.   Argued February 22, 1977—Decided June 24, 1977

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined, and in Parts I–III of which BRENNAN, J., joined. POWELL, J., filed a concurring opinion, *post*, p. 217. STEVENS, J., filed an opinion concurring in the

judgment, *post*, p. 217. BRENNAN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 219. REHNQUIST, J., took no part in the consideration or decision of the case.

*John R. Reese* argued the cause for appellants. With him on the briefs were *Edmund N. Carpenter II, R. Franklin Balotti,* and *Lynn H. Pasahow.*

*Michael F. Maschio* argued the cause for appellee. With him on the brief was *Joshua M. Twilley.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The controversy in this case concerns the constitutionality of a Delaware statute that allows a court of that State to take jurisdiction of a lawsuit by sequestering any property of the defendant that happens to be located in Delaware. Appellants contend that the sequestration statute as applied in this case violates the Due Process Clause of the Fourteenth Amendment both because it permits the state courts to exercise jurisdiction despite the absence of sufficient contacts among the defendants, the litigation, and the State of Delaware and because it authorizes the deprivation of defendants' property without providing adequate procedural safeguards. We find it necessary to consider only the first of these contentions.

I

Appellee Heitner, a nonresident of Delaware, is the owner of one share of stock in the Greyhound Corp., a business incorporated under the laws of Delaware with its principal place of business in Phoenix, Ariz. On May 22, 1974, he filed a shareholder's derivative suit in the Court of Chancery for New Castle County, Del., in which he named as defendants Greyhound, its wholly owned subsidiary Greyhound Lines, Inc.,[1] and 28 present or former officers or directors of one or

---

[1] Greyhound Lines, Inc., is incorporated in California and has its principal place of business in Phoenix, Ariz.

both of the corporations. In essence, Heitner alleged that the individual defendants had violated their duties to Greyhound by causing it and its subsidiary to engage in actions that resulted in the corporations being held liable for substantial damages in a private antitrust suit [2] and a large fine in a criminal contempt action.[3] The activities which led to these penalties took place in Oregon.

Simultaneously with his complaint, Heitner filed a motion for an order of sequestration of the Delaware property of the individual defendants pursuant to Del. Code Ann., Tit. 10, § 366 (1975).[4] This motion was accompanied by a supporting

---

[2] A judgment of $13,146,090 plus attorneys' fees was entered against Greyhound in *Mt. Hood Stages, Inc.* v. *Greyhound Corp.*, 1972–3 Trade Cas. ¶ 74,824, aff'd, — F. 2d — (CA9 1977); App. 10.

[3] See *United States* v. *Greyhound Corp.*, 363 F. Supp. 525 (ND Ill. 1973) and 370 F. Supp. 881 (ND Ill.), aff'd, 508 F. 2d 529 (CA7 1974). Greyhound was fined $100,000 and Greyhound Lines $500,000.

[4] Section 366 provides:

"(a) If it appears in any complaint filed in the Court of Chancery that the defendant or any one or more of the defendants is a nonresident of the State, the Court may make an order directing such nonresident defendant or defendants to appear by a day certain to be designated. Such order shall be served on such nonresident defendant or defendants by mail or otherwise, if practicable, and shall be published in such manner as the Court directs, not less than once a week for 3 consecutive weeks. The Court may compel the appearance of the defendant by the seizure of all or any part of his property, which property may be sold under the order of the Court to pay the demand of the plaintiff, if the defendant does not appear, or otherwise defaults. Any defendant whose property shall have been so seized and who shall have entered a general appearance in the cause may, upon notice to the plaintiff, petition the Court for an order releasing such property or any part thereof from the seizure. The Court shall release such property unless the plaintiff shall satisfy the Court that because of other circumstances there is a reasonable possibility that such release may render it substantially less likely that plaintiff will obtain satisfaction of any judgment secured. If such petition shall not be granted, or if no such petition shall be filed, such property shall remain subject to seizure and may be sold to satisfy any judgment entered in the

affidavit of counsel which stated that the individual defendants were nonresidents of Delaware. The affidavit identified the property to be sequestered as

> "common stock, 3% Second Cumulative Preferred Stock and stock unit credits of the Defendant Greyhound Corporation, a Delaware corporation, as well as all options and all warrants to purchase said stock issued to said individual Defendants and all contractual [*sic*] obligations, all rights, debts or credits due or accrued to or for the benefit of any of the said Defendants under any type of written agreement, contract or other legal instrument of any kind whatever between any of the individual Defendants and said corporation."

The requested sequestration order was signed the day the motion was filed.[5] Pursuant to that order, the sequestrator [6]

---

cause. The Court may at any time release such property or any part thereof upon the giving of sufficient security.

"(b) The Court may make all necessary rules respecting the form of process, the manner of issuance and return thereof, the release of such property from seizure and for the sale of the property so seized, and may require the plaintiff to give approved security to abide any order of the Court respecting the property.

"(c) Any transfer or assignment of the property so seized after the seizure thereof shall be void and after the sale of the property is made and confirmed, the purchaser shall be entitled to and have all the right, title and interest of the defendant in and to the property so seized and sold and such sale and confirmation shall transfer to the purchaser all the right, title and interest of the defendant in and to the property as fully as if the defendant had transferred the same to the purchaser in accordance with law."

[5] As a condition of the sequestration order, both the plaintiff and the sequestrator were required to file bonds of $1,000 to assure their compliance with the orders of the court. App. 24.

Following a technical amendment of the complaint, the original sequestration order was vacated and replaced by an alias sequestration order identical in its terms to the original.

[6] The sequestrator is appointed by the court to effect the sequestration. His duties appear to consist of serving the sequestration order on the

"seized" approximately 82,000 shares of Greyhound common stock belonging to 19 of the defendants,[7] and options belonging to another 2 defendants.[8] These seizures were accomplished by placing "stop transfer" orders or their equivalents on the books of the Greyhound Corp. So far as the record shows, none of the certificates representing the seized property was physically present in Delaware. The stock was considered to be in Delaware, and so subject to seizure, by virtue of Del. Code Ann., Tit. 8, § 169 (1975), which makes Delaware the situs of ownership of all stock in Delaware corporations.[9]

All 28 defendants were notified of the initiation of the suit by certified mail directed to their last known addresses and by publication in a New Castle County newspaper. The 21 defendants whose property was seized (hereafter referred to as appellants) responded by entering a special appearance for

---

named corporation, receiving from that corporation a list of the property which the order affects, and filing that list with the court. For performing those services in this case, the sequestrator received a fee of $100 under the original sequestration order and $100 under the alias order.

[7] The closing price of Greyhound stock on the day the sequestration order was issued was $14⅜. New York Times, May 23, 1974, p. 62. Thus, the value of the sequestered stock was approximately $1.2 million.

[8] Debentures, warrants, and stock unit credits belonging to some of the defendants who owned either stock or options were also sequestered. In addition, Greyhound reported that it had an employment contract with one of the defendants calling for payment of $250,000 over a 12-month period. Greyhound refused to furnish any further information on that debt on the ground that since the sums due constituted wages, their seizure would be unconstitutional. See *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969). Heitner did not challenge this refusal.

The remaining defendants apparently owned no property subject to the sequestration order.

[9] Section 169 provides:

"For all purposes of title, action, attachment, garnishment and jurisdiction of all courts held in this State, but not for the purpose of taxation, the situs of the ownership of the capital stock of all corporations existing under the laws of this State, whether organized under this chapter or otherwise, shall be regarded as in this State."

the purpose of moving to quash service of process and to vacate the sequestration order. They contended that the *ex parte* sequestration procedure did not accord them due process of law and that the property seized was not capable of attachment in Delaware. In addition, appellants asserted that under the rule of *International Shoe Co.* v. *Washington,* 326 U. S. 310 (1945), they did not have sufficient contacts with Delaware to sustain the jurisdiction of that State's courts.

The Court of Chancery rejected these arguments in a letter opinion which emphasized the purpose of the Delaware sequestration procedure:

> "The primary purpose of 'sequestration' as authorized by 10 *Del. C.* § 366 is not to secure possession of property pending a trial between resident debtors and creditors on the issue of who has the right to retain it. On the contrary, as here employed, 'sequestration' is a process used to compel the personal appearance of a nonresident defendant to answer and defend a suit brought against him in a court of equity. *Sands* v. *Lefcourt Realty Corp.,* Del. Supr., 117 A. 2d 365 (1955). It is accomplished by the appointment of a sequestrator by this Court to seize and hold property of the nonresident located in this State subject to further Court order. If the defendant enters a general appearance, the sequestered property is routinely released, unless the plaintiff makes special application to continue its seizure, in which event the plaintiff has the burden of proof and persuasion." App. 75–76.

This limitation on the purpose and length of time for which sequestered property is held, the court concluded, rendered inapplicable the due process requirements enunciated in *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337 (1969); *Fuentes* v. *Shevin,* 407 U. S. 67 (1972); and *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600 (1974). App. 75–76, 80, 83–85. The court also found no state-law or federal constitutional barrier to the sequestrator's reliance on Del. Code Ann., Tit. 8, § 169

(1975). App. 76–79. Finally, the court held that the statutory Delaware situs of the stock provided a sufficient basis for the exercise of *quasi in rem* jurisdiction by a Delaware court. *Id.*, at 85–87.

On appeal, the Delaware Supreme Court affirmed the judgment of the Court of Chancery. *Greyhound Corp.* v. *Heitner*, 361 A. 2d 225 (1976). Most of the Supreme Court's opinion was devoted to rejecting appellants' contention that the sequestration procedure is inconsistent with the due process analysis developed in the *Sniadach* line of cases. The court based its rejection of that argument in part on its agreement with the Court of Chancery that the purpose of the sequestration procedure is to compel the appearance of the defendant, a purpose not involved in the *Sniadach* cases. The court also relied on what it considered the ancient origins of the sequestration procedure and approval of that procedure in the opinions of this Court,[10] Delaware's interest in asserting jurisdiction to adjudicate claims of mismanagement of a Delaware corporation, and the safeguards for defendants that it found in the Delaware statute. 361 A. 2d, at 230–236.

---

[10] The court relied, 361 A. 2d, at 228, 230–231, on our decision in *Ownbey* v. *Morgan*, 256 U. S. 94 (1921), and references to that decision in *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.*, 419 U. S. 601, 610 (1975) (POWELL, J., concurring in judgment); *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 679 n. 14 (1974); *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600, 613 (1974); *Fuentes* v. *Shevin*, 407 U. S. 67, 91 n. 23 (1972); *Sniadach* v. *Family Finance Corp.*, supra, at 339. The only question before the Court in *Ownbey* was the constitutionality of a requirement that a defendant whose property has been attached file a bond before entering an appearance. We do not read the recent references to *Ownbey* as necessarily suggesting that *Ownbey* is consistent with more recent decisions interpreting the Due Process Clause.

Sequestration is the equity counterpart of the process of foreign attachment in suits at law considered in *Ownbey*. Delaware's sequestration statute was modeled after its attachment statute. See *Sands* v. *Lefcourt Realty Corp.*, 35 Del. Ch. 340, 344–345, 117 A. 2d 365, 367 (Sup. Ct. 1955); Folk & Moyer, Sequestration in Delaware: A Constitutional Analysis, 73 Colum. L. Rev. 749, 751–754 (1973).

Appellants' claim that the Delaware courts did not have jurisdiction to adjudicate this action received much more cursory treatment. The court's analysis of the jurisdictional issue is contained in two paragraphs:

"There are significant constitutional questions at issue here but we say at once that we do not deem the rule of *International Shoe* to be one of them. . . . The reason, of course, is that jurisdiction under § 366 remains . . . *quasi in rem* founded on the presence of capital stock here, not on prior contact by defendants with this forum. Under 8 Del. C. § 169 the 'situs of the ownership of the capital stock of all corporations existing under the laws of this State . . . [is] in this State,' and that provides the initial basis for jurisdiction. Delaware may constitutionally establish situs of such shares here, . . . it has done so and the presence thereof provides the foundation for § 366 in this case. . . . On this issue we agree with the analysis made and the conclusion reached by Judge Stapleton in *U. S. Industries, Inc.* v. *Gregg,* D. Del., 348 F. Supp. 1004 (1972).[11]

"We hold that seizure of the Greyhound shares is not invalid because plaintiff has failed to meet the prior contacts tests of *International Shoe.*" *Id.,* at 229.

We noted probable jurisdiction. 429 U. S. 813.[12] We reverse.

---

[11] The District Court judgment in *U. S. Industries* was reversed by the Court of Appeals for the Third Circuit. 540 F. 2d 142 (1976), cert. pending, No. 76–359. The Court of Appeals characterized the passage from the Delaware Supreme Court's opinion quoted in text as "cryptic conclusions." *Id.,* at 149.

[12] Under Delaware law, defendants whose property has been sequestered must enter a general appearance, thus subjecting themselves to *in personam* liability, before they can defend on the merits. See *Greyhound Corp.* v. *Heitner,* 361 A. 2d 225, 235–236 (1976). Thus, if the judgment below were considered not to be an appealable final judgment, 28 U. S. C. § 1257 (2), appellants would have the choice of suffering a default judgment or entering

## II

The Delaware courts rejected appellants' jurisdictional challenge by noting that this suit was brought as a *quasi in rem* proceeding.  Since *quasi in rem* jurisdiction is traditionally based on attachment or seizure of property present in the jurisdiction, not on contacts between the defendant and the State, the courts considered appellants' claimed lack of contacts with Delaware to be unimportant.  This categorical analysis assumes the continued soundness of the conceptual structure founded on the century-old case of *Pennoyer* v. *Neff*, 95 U. S. 714 (1878).

*Pennoyer* was an ejectment action brought in federal court under the diversity jurisdiction.  Pennoyer, the defendant in that action, held the land under a deed purchased in a sheriff's sale conducted to realize on a judgment for attorney's fees obtained against Neff in a previous action by one Mitchell.  At the time of Mitchell's suit in an Oregon State court, Neff was a nonresident of Oregon.  An Oregon statute allowed service by publication on nonresidents who had property in the State,[13] and Mitchell had used that procedure to bring Neff

a general appearance and defending on the merits.  This case is in the same posture as was *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 485 (1975):

"The [Delaware] Supreme Court's judgment is plainly final on the federal issue and is not subject to further review in the state courts.  Appellants will be liable for damages if the elements of the state cause of action are proved.  They may prevail at trial on nonfederal grounds, it is true, but if the [Delaware] court erroneously upheld the statute, there should be no trial at all."

Accordingly, "consistent with the pragmatic approach that we have followed in the past in determining finality," *id.*, at 486, we conclude that the judgment below is final within the meaning of § 1257.

[13] The statute also required that a copy of the summons and complaint be mailed to the defendant if his place of residence was known to the plaintiff or could be determined with reasonable diligence.  95 U. S., at 718.  Mitchell had averred that he did not know and could not determine Neff's address, so that the publication was the only "notice" given.  *Id.*, at 717.

before the court. The United States Circuit Court for the District of Oregon, in which Neff brought his ejectment action, refused to recognize the validity of the judgment against Neff in Mitchell's suit, and accordingly awarded the land to Neff.[14] This Court affirmed.

Mr. Justice Field's opinion for the Court focused on the territorial limits of the States' judicial powers. Although recognizing that the States are not truly independent sovereigns, Mr. Justice Field found that their jurisdiction was defined by the "principles of public law" that regulate the relationships among independent nations. The first of those principles was "that every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory." The second was "that no State can exercise direct jurisdiction and authority over persons or property without its territory." *Id.*, at 722. Thus, "in virtue of the State's jurisdiction over the property of the non-resident situated within its limits," the state courts "can inquire into that non-resident's obligations to its own citizens . . . to the extent necessary to control the disposition of the property." *Id.*, at 723. The Court recognized that if the conclusions of that inquiry were adverse to the nonresident property owner, his interest in the property would be affected. *Ibid.* Similarly, if the defendant consented to the jurisdiction of the state courts or was personally served within the State, a judgment could affect his interest in property outside the State. But any attempt "directly" to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power. A judgment resulting from such an attempt, Mr. Justice Field concluded, was not only unen-

---

[14] The Federal Circuit Court based its ruling on defects in Mitchell's affidavit in support of the order for service by publication and in the affidavit by which publication was proved. *Id.*, at 720. Mr. Justice Field indicated that if this Court had confined itself to considering those rulings, the judgment would have been reversed. *Id.*, at 721.

forceable in other States,[15] but was also void in the rendering State because it had been obtained in violation of the Due Process Clause of the Fourteenth Amendment.  *Id.*, at 732–733.  See also, *e. g.*, *Freeman* v. *Alderson,* 119 U. S. 185, 187–188 (1886).

This analysis led to the conclusion that Mitchell's judgment against Neff could not be validly based on the State's power over persons within its borders, because Neff had not been personally served in Oregon, nor had he consensually appeared before the Oregon court.  The Court reasoned that even if Neff had received personal notice of the action, service of process outside the State would have been ineffectual since the State's power was limited by its territorial boundaries.  Moreover, the Court held, the action could not be sustained on the basis of the State's power over property within its borders because that property had not been brought before the court by attachment or any other procedure prior to judgment.[16]  Since the judgment which authorized the sheriff's sale was therefore invalid, the sale transferred no title.  Neff regained his land.

From our perspective, the importance of *Pennoyer* is not its result, but the fact that its principles and corollaries derived from them became the basic elements of the constitu-

---

[15] The doctrine that one State does not have to recognize the judgment of another State's courts if the latter did not have jurisdiction was firmly established at the time of *Pennoyer.*  See, *e. g.*, *D'Arcy* v. *Ketchum,* 11 How. 165 (1851); *Boswell's Lessee* v. *Otis,* 9 How. 336 (1850); *Kibbe* v. *Kibbe,* 1 Kirby 119 (Conn. Super. Ct. 1786).

[16] Attachment was considered essential to the state court's jurisdiction for two reasons.  First, attachment combined with substituted service would provide greater assurance that the defendant would actually receive notice of the action than would publication alone.  Second, since the court's jurisdiction depended on the defendant's ownership of property in the State and could be defeated if the defendant disposed of that property, attachment was necessary to assure that the court had jurisdiction when the proceedings began and continued to have jurisdiction when it entered judgment.  95 U. S., at 727–728.

tional doctrine governing state-court jurisdiction. See, *e. g.,* Hazard, A General Theory of State-Court Jurisdiction, 1965 Sup. Ct. Rev. 241 (hereafter Hazard). As we have noted, under *Pennoyer* state authority to adjudicate was based on the jurisdiction's power over either persons or property. This fundamental concept is embodied in the very vocabulary which we use to describe judgments. If a court's jurisdiction is based on its authority over the defendant's person, the action and judgment are denominated *"in personam"* and can impose a personal obligation on the defendant in favor of the plaintiff. If jurisdiction is based on the court's power over property within its territory, the action is called *"in rem"* or *"quasi in rem."* The effect of a judgment in such a case is limited to the property that supports jurisdiction and does not impose a personal liability on the property owner, since he is not before the court.[17] In *Pennoyer's* terms, the owner is affected only "indirectly" by an *in rem* judgment adverse to his interest in the property subject to the court's disposition.

By concluding that "[t]he authority of every tribunal is necessarily restricted by the territorial limits of the State in which it is established," 95 U. S., at 720, *Pennoyer* sharply limited the availability of *in personam* jurisdiction over defendants not resident in the forum State. If a nonresident defendant could not be found in a State, he could not be sued there. On the other hand, since the State in which property

---

[17] "A judgment *in rem* affects the interests of all persons in designated property. A judgment *quasi in rem* affects the interests of particular persons in designated property. The latter is of two types. In one the plaintiff is seeking to secure a pre-existing claim in the subject property and to extinguish or establish the nonexistence of similar interests of particular persons. In the other the plaintiff seeks to apply what he concedes to be the property of the defendant to the satisfaction of a claim against him. Restatement, Judgments, 5-9." *Hanson* v. *Denckla,* 357 U. S. 235, 246 n. 12 (1958).

As did the Court in *Hanson,* we will for convenience generally use the term *"in rem"* in place of *"in rem* and *quasi in rem."*

was located was considered to have exclusive sovereignty over that property, *in rem* actions could proceed regardless of the owner's location. Indeed, since a State's process could not reach beyond its borders, this Court held after *Pennoyer* that due process did not require any effort to give a property owner personal notice that his property was involved in an *in rem* proceeding. See, *e. g., Ballard* v. *Hunter,* 204 U. S. 241 (1907); *Arndt* v. *Griggs,* 134 U. S. 316 (1890); *Huling* v. *Kaw Valley R. Co.,* 130 U. S. 559 (1889).

The *Pennoyer* rules generally favored nonresident defendants by making them harder to sue. This advantage was reduced, however, by the ability of a resident plaintiff to satisfy a claim against a nonresident defendant by bringing into court any property of the defendant located in the plaintiff's State. See, *e. g.,* Zammit, Quasi-In-Rem Jurisdiction: Outmoded and Unconstitutional?, 49 St. John's L. Rev. 668, 670 (1975). For example, in the well-known case of *Harris* v. *Balk,* 198 U. S. 215 (1905), Epstein, a resident of Maryland, had a claim against Balk, a resident of North Carolina. Harris, another North Carolina resident, owed money to Balk. When Harris happened to visit Maryland, Epstein garnished his debt to Balk. Harris did not contest the debt to Balk and paid it to Epstein's North Carolina attorney. When Balk later sued Harris in North Carolina, this Court held that the Full Faith and Credit Clause, U. S. Const., Art. IV, § 1, required that Harris' payment to Epstein be treated as a discharge of his debt to Balk. This Court reasoned that the debt Harris owed Balk was an intangible form of property belonging to Balk, and that the location of that property traveled with the debtor. By obtaining personal jurisdiction over Harris, Epstein had "arrested" his debt to Balk, 198 U. S., at 223, and brought it into the Maryland court. Under the structure established by *Pennoyer,* Epstein was then entitled to proceed against that debt to vindicate his claim against Balk, even though Balk himself was not subject to the juris-

diction of a Maryland tribunal.[18]   See also, *e. g., Louisville &
N. R. Co.* v. *Deer,* 200 U. S. 176 (1906); *Steele* v. *G. D. Searle
& Co.,* 483 F. 2d 339 (CA5 1973), cert. denied, 415 U. S. 958
(1974).

*Pennoyer* itself recognized that its rigid categories, even
as blurred by the kind of action typified by *Harris,* could not
accommodate some necessary litigation.   Accordingly, Mr.
Justice Field's opinion carefully noted that cases involving the
personal status of the plaintiff, such as divorce actions, could
be adjudicated in the plaintiff's home State even though the
defendant could not be served within that State.   95 U. S., at
733–735.   Similarly, the opinion approved the practice of con-
sidering a foreign corporation doing business in a State to have
consented to being sued in that State.   *Id.,* at 735–736; see
*Lafayette Ins. Co.* v. *French,* 18 How. 404 (1856).   This

---

[18] The Court in *Harris* limited its holding to States in which the
principal defendant (Balk) could have sued the garnishee (Harris) if he
had obtained personal jurisdiction over the garnishee in that State.   198
U. S., at 222–223, 226.   The Court explained:

"The importance of the fact of the right of the original creditor to sue
his debtor in the foreign State, as affecting the right of the creditor of
that creditor to sue the debtor or garnishee, lies in the nature of the
attachment proceeding.   The plaintiff, in such proceeding in the foreign
State is able to sue out the attachment and attach the debt due from the
garnishee to his (the garnishee's) creditor, because of the fact that the
plaintiff is really in such proceeding a representative of the creditor of the
garnishee, and therefore if such creditor himself had the right to commence
suit to recover the debt in the foreign State his representative has the same
right, as representing him, and may garnish or attach the debt, provided
the municipal law of the State where the attachment was sued out permits
it."   *Id.,* at 226.

The problem with this reasoning is that unless the plaintiff has obtained
a judgment establishing his claim against the principal defendant, see,
*e. g., Baltimore & O. R. Co.* v. *Hostetter,* 240 U. S. 620 (1916), his right
to "represent" the principal defendant in an action against the garnishee
is at issue.   See Beale, The Exercise of Jurisdiction *in Rem* to Compel
Payment of a Debt, 27 Harv. L. Rev. 107, 118–120 (1913).

basis for *in personam* jurisdiction over foreign corporations was later supplemented by the doctrine that a corporation doing business in a State could be deemed "present" in the State, and so subject to service of process under the rule of *Pennoyer.* See, *e. g., International Harvester Co.* v. *Kentucky,* 234 U. S. 579 (1914); *Philadelphia & Reading R. Co.* v. *McKibbin,* 243 U. S. 264 (1917). See generally Note, Developments in the Law, State-Court Jurisdiction, 73 Harv. L. Rev. 909, 919–923 (1960) (hereafter Developments).

The advent of automobiles, with the concomitant increase in the incidence of individuals causing injury in States where they were not subject to *in personam* actions under *Pennoyer,* required further moderation of the territorial limits on jurisdictional power. This modification, like the accommodation to the realities of interstate corporate activities, was accomplished by use of a legal fiction that left the conceptual structure established in *Pennoyer* theoretically unaltered. Cf. *Olberding* v. *Illinois Central R. Co.,* 346 U. S. 338, 340–341 (1953). The fiction used was that the out-of-state motorist, who it was assumed could be excluded altogether from the State's highways, had by using those highways appointed a designated state official as his agent to accept process. See *Hess* v. *Pawloski,* 274 U. S. 352 (1927). Since the motorist's "agent" could be personally served within the State, the state courts could obtain *in personam* jurisdiction over the nonresident driver.

The motorists' consent theory was easy to administer since it required only a finding that the out-of-state driver had used the State's roads. By contrast, both the fictions of implied consent to service on the part of a foreign corporation and of corporate presence required a finding that the corporation was "doing business" in the forum State. Defining the criteria for making that finding and deciding whether they were met absorbed much judicial energy. See, *e. g., International Shoe*

*Co.* v. *Washington,* 326 U. S., at 317–319. While the essentially quantitative tests which emerged from these cases purported simply to identify circumstances under which presence or consent could be attributed to the corporation, it became clear that they were in fact attempting to ascertain "what dealings make it just to subject a foreign corporation to local suit." *Hutchinson* v. *Chase & Gilbert,* 45 F. 2d 139, 141 (CA2 1930) (L. Hand, J.). In *International Shoe,* we acknowledged that fact.

The question in *International Shoe* was whether the corporation was subject to the judicial and taxing jurisdiction of Washington. Mr. Chief Justice Stone's opinion for the Court began its analysis of that question by noting that the historical basis of *in personam* jurisdiction was a court's power over the defendant's person. That power, however, was no longer the central concern:

> "But now that the *capias ad respondendum* has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' *Milliken* v. *Meyer,* 311 U. S. 457, 463." 326 U. S., at 316.

Thus, the inquiry into the State's jurisdiction over a foreign corporation appropriately focused not on whether the corporation was "present" but on whether there have been

> "such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." *Id.,* at 317.

Mechanical or quantitative evaluations of the defendant's activities in the forum could not resolve the question of reasonableness:

> "Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations." *Id.,* at 319.[19]

Thus, the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States on which the rules of *Pennoyer* rest, became the central concern of the inquiry into personal jurisdiction.[20] The immediate effect of this departure from *Pennoyer*'s conceptual apparatus was to increase the ability of the state courts to obtain personal jurisdiction over nonresident defendants. See, *e. g.,* Green, Jurisdictional Reform in California,

---

[19] As the language quoted indicates, the *International Shoe* Court believed that the standard it was setting forth governed actions against natural persons as well as corporations, and we see no reason to disagree. See also *McGee* v. *International Life Ins. Co.,* 355 U. S. 220, 222 (1957) (*International Shoe* culmination of trend toward expanding state jurisdiction over "foreign corporations and other nonresidents"). The differences between individuals and corporations may, of course, lead to the conclusion that a given set of circumstances establishes state jurisdiction over one type of defendant but not over the other.

[20] Nothing in *Hanson* v. *Denckla,* 357 U. S. 235 (1958), is to the contrary. The *Hanson* Court's statement that restrictions on state jurisdiction "are a consequence of territorial limitations on the power of the respective States," *id.,* at 251, simply makes the point that the States are defined by their geographical territory. After making this point, the Court in *Hanson* determined that the defendant over which personal jurisdiction was claimed had not committed any acts sufficiently connected to the State to justify jurisdiction under the *International Shoe* standard.

21 Hastings L. J. 1219, 1231–1233 (1970); Currie, The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois, 1963 U. Ill. L. F. 533; Developments 1000–1008.

No equally dramatic change has occurred in the law governing jurisdiction *in rem*. There have, however, been intimations that the collapse of the *in personam* wing of *Pennoyer* has not left that decision unweakened as a foundation for *in rem* jurisdiction. Well-reasoned lower court opinions have questioned the proposition that the presence of property in a State gives that State jurisdiction to adjudicate rights to the property regardless of the relationship of the underlying dispute and the property owner to the forum. See, *e. g., U. S. Industries, Inc.* v. *Gregg,* 540 F. 2d 142 (CA3 1976), cert. pending, No. 76–359; *Jonnet* v. *Dollar Savings Bank,* 530 F. 2d 1123, 1130–1143 (CA3 1976) (Gibbons, J., concurring); *Camire* v. *Scieszka,* 116 N. H. 281, 358 A. 2d 397 (1976); *Bekins* v. *Huish,* 1 Ariz. App. 258, 401 P. 2d 743 (1965); *Atkinson* v. *Superior Court,* 49 Cal. 2d 338, 316 P. 2d 960 (1957), appeal dismissed and cert. denied *sub nom. Columbia Broadcasting System* v. *Atkinson,* 357 U. S. 569 (1958). The overwhelming majority of commentators have also rejected *Pennoyer*'s premise that a proceeding "against" property is not a proceeding against the owners of that property. Accordingly, they urge that the "traditional notions of fair play and substantial justice" that govern a State's power to adjudicate *in personam* should also govern its power to adjudicate personal rights to property located in the State. See, *e. g.,* Von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121 (1966) (hereafter Von Mehren & Trautman); Traynor, Is This Conflict Really Necessary?, 37 Texas L. Rev. 657 (1959) (hereafter Traynor); Ehrenzweig, The Transient Rule of Personal Jurisdiction: The "Power" Myth and Forum Conveniens, 65 Yale L. J. 289 (1956); Developments; Hazard.

Although this Court has not addressed this argument directly, we have held that property cannot be subjected to a court's judgment unless reasonable and appropriate efforts have been made to give the property owners actual notice of the action. *Schroeder* v. *City of New York,* 371 U. S. 208 (1962); *Walker* v. *City of Hutchinson,* 352 U. S. 112 (1956); *Mullane* v. *Central Hanover Bank & Trust Co.,* 339 U. S. 306 (1950). This conclusion recognizes, contrary to *Pennoyer,* that an adverse judgment *in rem* directly affects the property owner by divesting him of his rights in the property before the court. *Schroeder* v. *City of New York, supra,* at 213; cf. *Continental Grain Co.* v. *Barge FBL–585,* 364 U. S. 19 (1960) (separate actions against barge and barge owner are one "civil action" for purpose of transfer under 28 U. S. C. § 1404 (a)). Moreover, in *Mullane* we held that Fourteenth Amendment rights cannot depend on the classification of an action as *in rem* or *in personam,* since that is

> "a classification for which the standards are so elusive and confused generally and which, being primarily for state courts to define, may and do vary from state to state." 339 U. S., at 312.

It is clear, therefore, that the law of state-court jurisdiction no longer stands securely on the foundation established in *Pennoyer.*[21] We think that the time is ripe to consider whether the standard of fairness and substantial justice set forth in *International Shoe* should be held to govern actions *in rem* as well as *in personam.*

---

[21] Cf. Restatement (Second) of Conflict of Laws § 59, Comment a (possible inconsistency between principle of reasonableness which underlies field of judicial jurisdiction and traditional rule of *in rem* jurisdiction based solely on land in State); § 60, Comment a (same as to jurisdiction based solely on chattel in State); § 68, Comment c (rule of *Harris* v. *Balk* "might be thought inconsistent with the basic principle of reasonableness") (1971).

## III

The case for applying to jurisdiction *in rem* the same test of "fair play and substantial justice" as governs assertions of jurisdiction *in personam* is simple and straightforward. It is premised on recognition that "[t]he phrase, 'judicial jurisdiction over a thing,' is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing." Restatement (Second) of Conflict of Laws § 56, Introductory Note (1971) (hereafter Restatement).[22] This recognition leads to the conclusion that in order to justify an exercise of jurisdiction *in rem*, the basis for jurisdiction must be sufficient to justify exercising "jurisdiction over the interests of persons in a thing."[23] The standard for determining whether an exercise of jurisdiction over the interests of persons is consistent with the Due Process Clause is the minimum-contacts standard elucidated in *International Shoe*.

This argument, of course, does not ignore the fact that the presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation. For example, when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant,[24] it would be unusual for the State where the property is located not to have jurisdiction. In such cases, the defendant's claim to property

---

[22] "All proceedings, like all rights, are really against persons. Whether they are proceedings or rights *in rem* depends on the number of persons affected." *Tyler* v. *Court of Registration*, 175 Mass. 71, 76, 55 N. E. 812, 814 (Holmes, C. J.), appeal dismissed, 179 U. S. 405 (1900).

[23] It is true that the potential liability of a defendant in an *in rem* action is limited by the value of the property, but that limitation does not affect the argument. The fairness of subjecting a defendant to state-court jurisdiction does not depend on the size of the claim being litigated. Cf. *Fuentes* v. *Shevin*, 407 U. S., at 88–90; n. 32, *infra*.

[24] This category includes true *in rem* actions and the first type of *quasi in rem* proceedings. See n. 17, *supra*.

located in the State would normally [25] indicate that he expected to benefit from the State's protection of his interest.[26] The State's strong interests in assuring the marketability of property within its borders [27] and in providing a procedure for peaceful resolution of disputes about the possession of that property would also support jurisdiction, as would the likelihood that important records and witnesses will be found in the State.[28] The presence of property may also favor jurisdiction in cases, such as suits for injury suffered on the land of an absentee owner, where the defendant's ownership of the property is conceded but the cause of action is otherwise related to rights and duties growing out of that ownership.[29]

It appears, therefore, that jurisdiction over many types of actions which now are or might be brought *in rem* would not be affected by a holding that any assertion of state-court jurisdiction must satisfy the *International Shoe* standard.[30] For the type of *quasi in rem* action typified by *Harris* v. *Balk* and the present case, however, accepting the proposed analysis would result in significant change. These are cases where

[25] In some circumstances the presence of property in the forum State will not support the inference suggested in text. Cf., *e. g.*, Restatement § 60, Comments c, d; Traynor 672–673; Note, The Power of a State to Affect Title in a Chattel Atypically Removed to It, 47 Colum. L. Rev. 767 (1947).

[26] Cf. *Hanson* v. *Denckla*, 357 U. S., at 253.

[27] See, *e. g.*, *Tyler* v. *Court of Registration, supra*.

[28] We do not suggest that these illustrations include all the factors that may affect the decision, nor that the factors we have mentioned are necessarily decisive.

[29] Cf. *Dubin* v. *Philadelphia*, 34 Pa. D. & C. 61 (1938). If such an action were brought under the *in rem* jurisdiction rather than under a long-arm statute, it would be a *quasi in rem* action of the second type. See n. 17, *supra*.

[30] Cf. Smit, The Enduring Utility of In Rem Rules: A Lasting Legacy of *Pennoyer* v. *Neff*, 43 Brooklyn L. Rev. 600 (1977). We do not suggest that jurisdictional doctrines other than those discussed in text, such as the particularized rules governing adjudications of status, are inconsistent with the standard of fairness. See, *e. g.*, Traynor 660–661.

the property which now serves as the basis for state-court jurisdiction is completely unrelated to the plaintiff's cause of action.  Thus, although the presence of the defendant's property in a State might suggest the existence of other ties among the defendant, the State, and the litigation, the presence of the property alone would not support the State's jurisdiction.  If those other ties did not exist, cases over which the State is now thought to have jurisdiction could not be brought in that forum.

Since acceptance of the *International Shoe* test would most affect this class of cases, we examine the arguments against adopting that standard as they relate to this category of litigation.[31]  Before doing so, however, we note that this type of case also presents the clearest illustration of the argument in favor of assessing assertions of jurisdiction by a single standard.  For in cases such as *Harris* and this one, the only role played by the property is to provide the basis for bringing the defendant into court.[32]  Indeed, the express purpose of the Delaware sequestration procedure is to compel the defendant to enter a personal appearance.[33]  In such cases, if a direct assertion of personal jurisdiction over the defendant would violate the Constitution, it would seem that an indirect assertion of that jurisdiction should be equally impermissible.

---

[31] Concentrating on this category of cases is also appropriate because in the other categories, to the extent that presence of property in the State indicates the existence of sufficient contacts under *International Shoe*, there is no need to rely on the property as justifying jurisdiction regardless of the existence of those contacts.

[32] The value of the property seized does serve to limit the extent of possible liability, but that limitation does not provide support for the assertion of jurisdiction.  See n. 23, *supra*.  In this case, appellants' potential liability under the *in rem* jurisdiction exceeds $1 million.  See nn. 7, 8, *supra*.

[33] See *supra*, at 193, 194.  This purpose is emphasized by Delaware's refusal to allow any defense on the merits unless the defendant enters a general appearance, thus submitting to full *in personam* liability.  See n. 12, *supra*.

The primary rationale for treating the presence of property as a sufficient basis for jurisdiction to adjudicate claims over which the State would not have jurisdiction if *International Shoe* applied is that a wrongdoer

> "should not be able to avoid payment of his obligations by the expedient of removing his assets to a place where he is not subject to an in personam suit." Restatement § 66, Comment a.

Accord, Developments 955. This justification, however, does not explain why jurisdiction should be recognized without regard to whether the property is present in the State because of an effort to avoid the owner's obligations. Nor does it support jurisdiction to adjudicate the underlying claim. At most, it suggests that a State in which property is located should have jurisdiction to attach that property, by use of proper procedures,[34] as security for a judgment being sought in a forum where the litigation can be maintained consistently with *International Shoe*. See, *e. g.*, Von Mehren & Trautman 1178; Hazard 284–285; Beale, *supra,* n. 18, at 123–124. Moreover, we know of nothing to justify the assumption that a debtor can avoid paying his obligations by removing his property to a State in which his creditor cannot obtain personal jurisdiction over him.[35] The Full Faith and Credit Clause, after all, makes the valid *in personam* judgment of one State enforceable in all other States.[36]

---

[34] See *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601 (1975); *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600 (1974); *Fuentes* v. *Shevin,* 407 U. S. 67 (1972); *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337 (1969).

[35] The role of *in rem* jurisdiction as a means of preventing the evasion of obligations, like the usefulness of that jurisdiction to mitigate the limitations *Pennoyer* placed on *in personam* jurisdiction, may once have been more significant. Von Mehren & Trautman 1178.

[36] Once it has been determined by a court of competent jurisdiction that the defendant is a debtor of the plaintiff, there would seem to be no unfairness in allowing an action to realize on that debt in a State where

It might also be suggested that allowing *in rem* jurisdiction avoids the uncertainty inherent in the *International Shoe* standard and assures a plaintiff of a forum.[37] See Folk & Moyer, *supra,* n. 10, at 749, 767. We believe, however, that the fairness standard of *International Shoe* can be easily applied in the vast majority of cases. Moreover, when the existence of jurisdiction in a particular forum under *International Shoe* is unclear, the cost of simplifying the litigation by avoiding the jurisdictional question may be the sacrifice of "fair play and substantial justice." That cost is too high.

We are left, then, to consider the significance of the long history of jurisdiction based solely on the presence of property in a State. Although the theory that territorial power is both essential to and sufficient for jurisdiction has been undermined, we have never held that the presence of property in a State does not automatically confer jurisdiction over the owner's interest in that property.[38] This history must be

the defendant has property, whether or not that State would have jurisdiction to determine the existence of the debt as an original matter. Cf. n. 18, *supra.*

[37] This case does not raise, and we therefore do not consider, the question whether the presence of a defendant's property in a State is a sufficient basis for jurisdiction when no other forum is available to the plaintiff.

[38] To the contrary, in *Pennington* v. *Fourth Nat. Bank,* 243 U. S. 269, 271 (1917), we said:

"The Fourteenth Amendment did not, in guaranteeing due process of law, abridge the jurisdiction which a State possessed over property within its borders, regardless of the residence or presence of the owner. That jurisdiction extends alike to tangible and to intangible property. Indebtedness due from a resident to a non-resident—of which bank deposits are an example—is property within the State. *Chicago, Rock Island & Pacific Ry. Co.* v. *Sturm,* 174 U. S. 710. It is, indeed, the species of property which courts of the several States have most frequently applied in satisfaction of the obligations of absent debtors. *Harris* v. *Balk,* 198 U. S. 215. Substituted service on a non-resident by publication furnishes no legal basis for a judgment *in personam. Pennoyer* v. *Neff,* 95 U. S. 714. But garnishment or foreign attachment is a proceeding *quasi in rem. Freeman* v. *Alderson,* 119 U. S. 185, 187. The thing belonging to the absent defendant is seized and applied to the satisfaction of his obligation. The

considered as supporting the proposition that jurisdiction based solely on the presence of property satisfies the demands of due process, cf. *Ownbey* v. *Morgan,* 256 U. S. 94, 111 (1921), but it is not decisive. "[T]raditional notions of fair play and substantial justice" can be as readily offended by the perpetuation of ancient forms that are no longer justified as by the adoption of new procedures that are inconsistent with the basic values of our constitutional heritage. Cf. *Sniadach* v. *Family Finance Corp.,* 395 U. S., at 340; *Wolf* v. *Colorado,* 338 U. S. 25, 27 (1949). The fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of the property supports an ancient form without substantial modern justification. Its continued acceptance would serve only to allow state-court jurisdiction that is fundamentally unfair to the defendant.

We therefore conclude that all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny.[39]

---

Federal Constitution presents no obstacle to the full exercise of this power."

See also *Huron Holding Corp.* v. *Lincoln Mine Operating Co.,* 312 U. S. 183, 193 (1941).

More recent decisions, however, contain no similar sweeping endorsements of jurisdiction based on property. In *Hanson* v. *Denckla,* 357 U. S., at 246, we noted that a state court's *in rem* jurisdiction is "[f]ounded on physical power" and that "[t]he basis of the jurisdiction is the presence of the subject property within the territorial jurisdiction of the forum State." We found in that case, however, that the property which was the basis for the assertion of *in rem* jurisdiction was not present in the State. We therefore did not have to consider whether the presence of property in the State was sufficient to justify jurisdiction. We also held that the defendant did not have sufficient contact with the State to justify *in personam* jurisdiction.

[39] It would not be fruitful for us to re-examine the facts of cases decided on the rationales of *Pennoyer* and *Harris* to determine whether jurisdiction might have been sustained under the standard we adopt today. To the extent that prior decisions are inconsistent with this standard, they are overruled.

## IV

The Delaware courts based their assertion of jurisdiction in this case solely on the statutory presence of appellants' property in Delaware. Yet that property is not the subject matter of this litigation, nor is the underlying cause of action related to the property. Appellants' holdings in Greyhound do not, therefore, provide contacts with Delaware sufficient to support the jurisdiction of that State's courts over appellants. If it exists, that jurisdiction must have some other foundation.[40]

Appellee Heitner did not allege and does not now claim that appellants have ever set foot in Delaware. Nor does he identify any act related to his cause of action as having taken place in Delaware. Nevertheless, he contends that appellants' positions as directors and officers of a corporation chartered in Delaware [41] provide sufficient "contacts, ties, or relations," *International Shoe Co.* v. *Washington,* 326 U. S., at

---

[40] Appellants argue that our determination that the minimum-contacts standard of *International Shoe* governs jurisdiction here makes unnecessary any consideration of the existence of such contacts. Brief for Appellants 27; Reply Brief for Appellants 9. They point out that they were never personally served with a summons, that Delaware has no long-arm statute which would authorize such service, and that the Delaware Supreme Court has authoritatively held that the existence of contacts is irrelevant to jurisdiction under Del. Code Ann., Tit. 10, § 366 (1975). As part of its sequestration order, however, the Court of Chancery directed its clerk to send each appellant a copy of the summons and complaint by certified mail. The record indicates that those mailings were made and contains return receipts from at least 19 of the appellants. None of the appellants has suggested that he did not actually receive the summons which was directed to him in compliance with a Delaware statute designed to provide jurisdiction over nonresidents. In these circumstances, we will assume that the procedures followed would be sufficient to bring appellants before the Delaware courts, if minimum contacts existed.

[41] On the view we take of the case, we need not consider the significance, if any, of the fact that some appellants hold positions only with a subsidiary of Greyhound which is incorporated in California.

319, with that State to give its courts jurisdiction over appellants in this stockholder's derivative action. This argument is based primarily on what Heitner asserts to be the strong interest of Delaware in supervising the management of a Delaware corporation. That interest is said to derive from the role of Delaware law in establishing the corporation and defining the obligations owed to it by its officers and directors. In order to protect this interest, appellee concludes, Delaware's courts must have jurisdiction over corporate fiduciaries such as appellants.

This argument is undercut by the failure of the Delaware Legislature to assert the state interest appellee finds so compelling. Delaware law bases jurisdiction, not on appellants' status as corporate fiduciaries, but rather on the presence of their property in the State. Although the sequestration procedure used here may be most frequently used in derivative suits against officers and directors, *Hughes Tool Co.* v. *Fawcett Publications, Inc.,* 290 A. 2d 693, 695 (Del. Ch. 1972), the authorizing statute evinces no specific concern with such actions. Sequestration can be used in any suit against a nonresident,[42] see, *e. g., U. S. Industries, Inc.* v. *Gregg,* 540 F. 2d 142 (CA3 1976), cert. pending, No. 76–359 (breach of contract); *Hughes Tool Co.* v. *Fawcett Publications, Inc., supra* (same), and reaches corporate fiduciaries only if they happen to own interests in a Delaware corporation, or other property in the State. But as Heitner's failure to secure jurisdiction over seven of the defendants named in his complaint demonstrates, there is no necessary relationship between holding a position as a corporate fiduciary and owning stock or other interests in the corporation.[43] If Delaware perceived its interest in securing jurisdiction over corporate fiduciaries

---

[42] Sequestration is an equitable procedure available only in equity actions, but a similar procedure may be utilized in actions at law. See n. 10, *supra.*

[43] Delaware does not require directors to own stock. Del. Code Ann., Tit. 8, § 141 (b) (Supp. 1976).

to be as great as Heitner suggests, we would expect it to have enacted a statute more clearly designed to protect that interest.

Moreover, even if Heitner's assessment of the importance of Delaware's interest is accepted, his argument fails to demonstrate that Delaware is a fair forum for this litigation. The interest appellee has identified may support the application of Delaware law to resolve any controversy over appellants' actions in their capacities as officers and directors.[44] But we have rejected the argument that if a State's law can properly be applied to a dispute, its courts necessarily have jurisdiction over the parties to that dispute.

> "[The State] does not acquire . . . jurisdiction by being the 'center of gravity' of the controversy, or the most convenient location for litigation. The issue is personal jurisdiction, not choice of law. It is resolved in this case by considering the acts of the [appellants]." *Hanson* v. *Denckla,* 357 U. S. 235, 254 (1958).[45]

Appellee suggests that by accepting positions as officers or directors of a Delaware corporation, appellants performed the acts required by *Hanson* v. *Denckla.* He notes that Delaware law provides substantial benefits to corporate officers and directors,[46] and that these benefits were at least in part

---

[44] In general, the law of the State of incorporation is held to govern the liabilities of officers or directors to the corporation and its stockholders. See Restatement § 309. But see Cal. Corp. Code § 2115 (West Supp. 1977). The rationale for the general rule appears to be based more on the need for a uniform and certain standard to govern the internal affairs of a corporation than on the perceived interest of the State of incorporation. Cf. *Koster* v. *Lumbermens Mutual Casualty Co.,* 330 U. S. 518, 527–528 (1947).

[45] Mr. Justice Black, although dissenting in *Hanson,* agreed with the majority that "the question whether the law of a State can be applied to a transaction is different from the question whether the courts of that State have jurisdiction to enter a judgment . . . ." 357 U. S., at 258.

[46] See, *e. g.,* Del. Code Ann., Tit. 8, §§ 143, 145 (1975 ed. and Supp. 1976).

the incentive for appellants to assume their positions. It is, he says, "only fair and just" to require appellants, in return for these benefits, to respond in the State of Delaware when they are accused of misusing their power. Brief for Appellee 15.

But like Heitner's first argument, this line of reasoning establishes only that it is appropriate for Delaware law to govern the obligations of appellants to Greyhound and its stockholders. It does not demonstrate that appellants have "purposefully avail[ed themselves] of the privilege of conducting activities within the forum State," *Hanson* v. *Denckla, supra,* at 253, in a way that would justify bringing them before a Delaware tribunal. Appellants have simply had nothing to do with the State of Delaware. Moreover, appellants had no reason to expect to be haled before a Delaware court. Delaware, unlike some States,[47] has not enacted a statute that treats acceptance of a directorship as consent to jurisdiction in the State. And "[i]t strains reason . . . to suggest that anyone buying securities in a corporation formed in Delaware 'impliedly consents' to subject himself to Delaware's . . . jurisdiction on any cause of action." Folk & Moyer, *supra,* n. 10, at 785. Appellants, who were not required to acquire interests in Greyhound in order to hold their positions, did not by acquiring those interests surrender their right to be brought to judgment only in States with which they had had "minimum contacts."

The Due Process Clause

> "does not contemplate that a state may make binding a judgment . . . against an individual or corporate defendant with which the state has no contacts, ties, or relations." *International Shoe Co.* v. *Washington,* 326 U. S., at 319.

Delaware's assertion of jurisdiction over appellants in this case is inconsistent with that constitutional limitation on

---

[47] See, *e. g.,* Conn. Gen. Stat. Rev. § 33–322 (1976); N. C. Gen. Stat. § 55–33 (1975); S. C. Code Ann. § 33–5–70 (1977).

state power. The judgment of the Delaware Supreme Court must, therefore, be reversed.

*It is so ordered.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE POWELL, concurring.

I agree that the principles of *International Shoe Co.* v. *Washington,* 326 U. S. 310 (1945), should be extended to govern assertions of *in rem* as well as *in personam* jurisdiction in a state court. I also agree that neither the statutory presence of appellants' stock in Delaware nor their positions as directors and officers of a Delaware corporation can provide sufficient contacts to support the Delaware courts' assertion of jurisdiction in this case.

I would explicitly reserve judgment, however, on whether the ownership of some forms of property whose situs is indisputably and permanently located within a State may, without more, provide the contacts necessary to subject a defendant to jurisdiction within the State to the extent of the value of the property. In the case of real property, in particular, preservation of the common-law concept of *quasi in rem* jurisdiction arguably would avoid the uncertainty of the general *International Shoe* standard without significant cost to " 'traditional notions of fair play and substantial justice.' " *Id.,* at 316, quoting *Milliken* v. *Meyer,* 311 U. S. 457, 463 (1940).

Subject to the foregoing reservation, I join the opinion of the Court.

MR. JUSTICE STEVENS, concurring in the judgment.

The Due Process Clause affords protection against "judgments without notice." *International Shoe Co.* v. *Washington,* 326 U. S. 310, 324 (opinion of Black, J.). Throughout our history the acceptable exercise of *in rem* and *quasi in rem*

218

jurisdiction has included a procedure giving reasonable assurance that actual notice of the particular claim will be conveyed to the defendant.* Thus, publication, notice by registered mail, or extraterritorial personal service has been an essential ingredient of any procedure that serves as a substitute for personal service within the jurisdiction.

The requirement of fair notice also, I believe, includes fair warning that a particular activity may subject a person to the jurisdiction of a foreign sovereign. If I visit another State, or acquire real estate or open a bank account in it, I knowingly assume some risk that the State will exercise its power over my property or my person while there. My contact with the State, though minimal, gives rise to predictable risks.

Perhaps the same consequences should flow from the purchase of stock of a corporation organized under the laws of a foreign nation, because to some limited extent one's property and affairs then become subject to the laws of the nation of domicile of the corporation. As a matter of international law, that suggestion might be acceptable because a foreign investment is sufficiently unusual to make it appropriate to require the investor to study the ramifications of his decision. But a purchase of securities in the domestic market is an entirely different matter.

One who purchases shares of stock on the open market can hardly be expected to know that he has thereby become subject to suit in a forum remote from his residence and unrelated to the transaction. As a practical matter, the Delaware sequestration statute creates an unacceptable risk of judgment without notice. Unlike the 49 other States, Delaware treats the place of incorporation as the situs of the stock, even though both the owner and the custodian of the shares are elsewhere. Moreover, Delaware denies the defend-

---

*"To dispense with personal service the substitute that is most likely to reach the defendant is the least that ought to be required if substantial justice is to be done." *McDonald* v. *Mabee,* 243 U. S. 90, 92.

ant the opportunity to defend the merits of the suit unless he subjects himself to the unlimited jurisdiction of the court. Thus, it coerces a defendant either to submit to personal jurisdiction in a forum which could not otherwise obtain such jurisdiction or to lose the securities which have been attached. If its procedure were upheld, Delaware would, in effect, impose a duty of inquiry on every purchaser of securities in the national market. For unless the purchaser ascertains both the State of incorporation of the company whose shares he is buying, and also the idiosyncrasies of its law, he may be assuming an unknown risk of litigation. I therefore agree with the Court that on the record before us no adequate basis for jurisdiction exists and that the Delaware statute is unconstitutional on its face.

How the Court's opinion may be applied in other contexts is not entirely clear to me. I agree with MR. JUSTICE POWELL that it should not be read to invalidate *quasi in rem* jurisdiction where real estate is involved. I would also not read it as invalidating other long-accepted methods of acquiring jurisdiction over persons with adequate notice of both the particular controversy and the fact that their local activities might subject them to suit. My uncertainty as to the reach of the opinion, and my fear that it purports to decide a great deal more than is necessary to dispose of this case, persuade me merely to concur in the judgment.

MR. JUSTICE BRENNAN, concurring in part and dissenting in part.

I join Parts I–III of the Court's opinion. I fully agree that the minimum-contacts analysis developed in *International Shoe Co.* v. *Washington,* 326 U. S. 310 (1945), represents a far more sensible construct for the exercise of state-court jurisdiction than the patchwork of legal and factual fictions that has been generated from the decision in *Pennoyer* v. *Neff,* 95 U. S. 714 (1878). It is precisely because

the inquiry into minimum contacts is now of such overriding importance, however, that I must respectfully dissent from Part IV of the Court's opinion.

## I

The primary teaching of Parts I–III of today's decision is that a State, in seeking to assert jurisdiction over a person located outside its borders, may only do so on the basis of minimum contacts among the parties, the contested transaction, and the forum State. The Delaware Supreme Court could not have · made plainer, however, that its sequestration statute, Del. Code Ann., Tit. 10, § 366 (1975), does not operate on this basis, but instead is strictly an embodiment of *quasi in rem* jurisdiction, a jurisdictional predicate no longer constitutionally viable:

> "[J]urisdiction under § 366 remains . . . *quasi in rem* founded on the presence of capital stock here, not on prior contact by defendants with this forum." *Greyhound Corp.* v. *Heitner*, 361 A. 2d 225, 229 (1976).

This state-court ruling obviously comports with the understanding of the parties, for the issue of the existence of minimum contacts was never pleaded by appellee, made the subject of discovery, or ruled upon by the Delaware courts. These facts notwithstanding, the Court in Part IV reaches the minimum-contacts question and finds such contacts lacking as applied to appellants. Succinctly stated, once having properly and persuasively decided that the *quasi in rem* statute that Delaware admits to having enacted is invalid, the Court then proceeds to find that a minimum-contacts law that Delaware expressly *denies* having enacted also could not be constitutionally applied in this case.

In my view, a purer example of an advisory opinion is not to be found. True, appellants do not deny having received actual notice of the action in question. *Ante,* at 213 n. 40.

However, notice is but one ingredient of a proper asser-
tion of state-court jurisdiction. The other is a statute au-
thorizing the exercise of the State's judicial power along
constitutionally permissible grounds—which henceforth means
minimum contacts. As of today, § 366 is not such a law.[1]
Recognizing that today's decision fundamentally alters the
relevant jurisdictional ground rules, I certainly would not
want to rule out the possibility that Delaware's courts might
decide that the legislature's overriding purpose of securing
the personal appearance in state courts of defendants would
best be served by reinterpreting its statute to permit state
jurisdiction on the basis of constitutionally permissible con-
tacts rather than stock ownership. Were the state courts
to take this step, it would then become necessary to address
the question of whether minimum contacts exist here. But
in the present posture of this case, the Court's decision of
this important issue is purely an abstract ruling.

My concern with the inappropriateness of the Court's ac-
tion is highlighted by two other considerations. First, an
inquiry into minimum contacts inevitably is highly depend-
ent on creating a proper factual foundation detailing the
contacts between the forum State and the controversy in
question. Because neither the plaintiff-appellee nor the
state courts viewed such an inquiry as germane in this in-
stance, the Court today is unable to draw upon a proper
factual record in reaching its conclusion; moreover, its dis-
position denies appellee the normal opportunity to seek dis-
covery on the contacts issue. Second, it must be remembered
that the Court's ruling is a constitutional one and necessarily

---

[1] Indeed the Court's decision to proceed to the minimum-contacts issue
treats Delaware's sequestration statute as if it were the equivalent of
Rhode Island's long-arm law, which specifically authorizes its courts to
assume jurisdiction to the limit permitted by the Constitution, R. I. Gen.
Laws Ann. § 9–5–33 (1970), thereby necessitating judicial consideration of
the frontiers of minimum contacts in every case arising under that statute.

will affect the reach of the jurisdictional laws of all 50 States. Ordinarily this would counsel restraint in constitutional pronouncements. *Ashwander* v. *TVA*, 297 U. S. 288, 345–348 (1936) (Brandeis, J., concurring). Certainly it should have cautioned the Court against reaching out to decide a question that, as here, has yet to emerge from the state courts ripened for review on the federal issue.

## II

Nonetheless, because the Court rules on the minimum-contacts question, I feel impelled to express my view. While evidence derived through discovery might satisfy me that minimum contacts are lacking in a given case, I am convinced that as a general rule a state forum has jurisdiction to adjudicate a shareholder derivative action centering on the conduct and policies of the directors and officers of a corporation chartered by that State. Unlike the Court, I therefore would not foreclose Delaware from asserting jurisdiction over appellants were it persuaded to do so on the basis of minimum contacts.

It is well settled that a derivative lawsuit as presented here does not inure primarily to the benefit of the named plaintiff. Rather, the primary beneficiaries are the corporation and its owners, the shareholders. "The cause of action which such a plaintiff brings before the court is not his own but the corporation's. . . . Such a plaintiff often may represent an important public and stockholder interest in bringing faithless managers to book." *Koster* v. *Lumbermens Mutual Casualty Co.*, 330 U. S. 518, 522, 524 (1947).

Viewed in this light, the chartering State has an unusually powerful interest in insuring the availability of a convenient forum for litigating claims involving a possible multiplicity of defendant fiduciaries and for vindicating the State's substantive policies regarding the management of its domestic corporations. I believe that our cases fairly establish that

the State's valid substantive interests are important considerations in assessing whether it constitutionally may claim jurisdiction over a given cause of action.

In this instance, Delaware can point to at least three interrelated public policies that are furthered by its assertion of jurisdiction. First, the State has a substantial interest in providing restitution for its local corporations that allegedly have been victimized by fiduciary misconduct, even if the managerial decisions occurred outside the State. The importance of this general state interest in assuring restitution for its own residents previously found expression in cases that went outside the then-prevailing due process framework to authorize state-court jurisdiction over nonresident motorists who injure others within the State. *Hess* v. *Pawloski,* 274 U. S. 352 (1927); see *Olberding* v. *Illinois Central R. Co.,* 346 U. S. 338, 341 (1953). More recently, it has led States to seek and to acquire jurisdiction over nonresident tortfeasors whose purely out-of-state activities produce domestic consequences. *E. g., Gray* v. *American Radiator & Standard Sanitary Corp.,* 22 Ill. 2d 432, 176 N. E. 2d 761 (1961). Second, state courts have legitimately read their jurisdiction expansively when a cause of action centers in an area in which the forum State possesses a manifest regulatory interest. *E. g., McGee* v. *International Life Ins. Co.,* 355 U. S. 220 (1957) (insurance regulation); *Travelers Health Assn.* v. *Virginia,* 339 U. S. 643 (1950) (blue sky laws). Only this Term we reiterated that the conduct of corporate fiduciaries is just such a matter in which the policies and interests of the domestic forum are ordinarily presumed to be paramount. *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 478–480 (1977); see *Cort* v. *Ash,* 422 U. S. 66, 84–85 (1975). Finally, a State like Delaware has a recognized interest in affording a convenient forum for supervising and overseeing the affairs of an entity that is purely the creation of that State's law. For example, even following our decision in

*International Shoe*, New York courts were permitted to exercise complete judicial authority over nonresident beneficiaries of a trust created under state law, even though, unlike appellants here, the beneficiaries personally entered into no association whatsoever with New York. *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313 (1950); [2] cf. *Hartford Life Ins. Co.* v. *Ibs*, 237 U. S. 662, 671 (1915) (litigation concerning management of mortuary fund operated by locally chartered corporation rests in court of that State); *Bernheimer* v. *Converse*, 206 U. S. 516, 533 (1907) (state courts can oversee liquidation of state-chartered corporation). I, of course, am not suggesting that Delaware's varied interests would justify its acceptance of jurisdiction over any transaction touching upon the affairs of its domestic corporations. But a derivative action which raises allegations of abuses of the basic management of an institution whose existence is created by the State and whose powers and duties are defined by state law fundamentally implicates the public policies of that forum.

To be sure, the Court is not blind to these considerations. It notes that the State's interests "may support the application of Delaware law to resolve any controversy over appellants' actions in their capacities as officers and directors." *Ante*, at 215. But this, the Court argues, pertains to choice of law, not jurisdiction. I recognize that the jurisdictional and choice-of-law inquiries are not identical. *Hanson* v. *Denckla*, 357 U. S. 235, 254 (1958). But I would not compartmentalize thinking in this area quite so rigidly as it seems to me the Court does today, for both inquiries "are

---

[2] The *Mullane* Court held: "[T]he interest of each state in providing means to close trusts that exist by the grace of its laws and are administered under the supervision of its courts is so insistent and rooted in custom as to establish beyond doubt the right of its courts to determine the interests of all claimants, resident or nonresident, provided its procedure accords full opportunity to appear and be heard." 339 U. S., at 313.

often closely related and to a substantial degree depend upon similar considerations." *Id.,* at 258 (Black, J., dissenting). In either case an important linchpin is the extent of contacts between the controversy, the parties, and the forum State. While constitutional limitations on the choice of law are by no means settled, see, *e. g., Home Ins. Co.* v. *Dick,* 281 U. S. 397 (1930), important considerations certainly include the expectancies of the parties and the fairness of governing the defendants' acts and behavior by rules of conduct created by a given jurisdiction. See, *e. g.,* Restatement (Second) of Conflict of Laws § 6 (1971) (hereafter Restatement). These same factors bear upon the propriety of a State's exercising jurisdiction over a legal dispute. At the minimum, the decision that it is fair to bind a defendant by a State's laws ·and rules should prove to be highly relevant to the fairness of permitting that same State to accept jurisdiction for adjudicating the controversy.

Furthermore, I believe that practical considerations argue in favor of seeking to bridge the distance between the choice-of-law and jurisdictional inquiries. Even when a court would apply the law of a different forum,[3] as a general rule · it will feel less knowledgeable and comfortable· in interpretation, and less interested in fostering the policies of that foreign jurisdiction, than would the courts established by the State that provides the applicable law. See, *e. g., Gulf Oil Co.* v. *Gilbert,* 330 U. S. 501, 509 (1947); Restatement § 313, p. 347; Traynor, Is This Conflict Really Necessary?, 37 Texas L. Rev. 657, 664 (1959). Obviously, such choice-of-law problems cannot entirely be avoided in a diverse legal system such as our own. Nonetheless, when a suitor

---

[3] In this case the record does not inform us whether an actual conflict is likely to arise between Delaware law and that of the likely alternative forum. Pursuant to the general rule, I assume that Delaware law probably would obtain in the foreign court. Restatement § 309.

seeks to lodge a suit in a State with a substantial interest in seeing its own law applied to the transaction in question, we could wisely act to minimize conflicts, confusion, and uncertainty by adopting a liberal view of jurisdiction, unless considerations of fairness or efficiency strongly point in the opposite direction.

This case is not one where, in my judgment, this preference for jurisdiction is adequately answered. Certainly nothing said by the Court persuades me that it would be unfair to subject appellants to suit in Delaware. The fact that the record does not reveal whether they "set foot" or committed "act[s] related to [the] cause of action" in Delaware, *ante,* at 213, is not decisive, for jurisdiction can be based strictly on out-of-state acts having foreseeable effects in the forum State. *E. g., McGee* v. *International Life Ins. Co., supra; Gray* v. *American Radiator & Standard Sanitary Corp., supra;* Restatement § 37. I have little difficulty in applying this principle to nonresident fiduciaries whose alleged breaches of trust are said to have substantial damaging effect on the financial posture of a resident corporation.[4] Further, I cannot understand how the existence of minimum contacts in a constitutional sense is at all affected by Delaware's failure statutorily to express an interest in controlling corporate fiduciaries. *Ante,* at 214. To me this simply demonstrates that Delaware

---

[4] I recognize, of course, that identifying a corporation as a resident of the chartering State is to build upon a legal fiction. In many respects, however, the law acts as if state chartering of a corporation has meaning. *E. g.,* 28 U. S. C. § 1332 (c) (for diversity purposes, a corporation is a citizen of the State of incorporation). And, if anything, the propriety of treating a corporation as a resident of the incorporating State seems to me particularly appropriate in the context of a shareholder derivative suit, for the State realistically may perceive itself as having a direct interest in guaranteeing the enforcement of its corporate laws, in assuring the solvency and fair management of its domestic corporations, and in protecting from fraud those shareholders who placed their faith in that state-created institution.

did not elect to assert jurisdiction to the extent the Constitution would allow.[5] Nor would I view as controlling or even especially meaningful Delaware's failure to exact from appellants their consent to be sued. *Ante*, at 216. Once we have rejected the jurisdictional framework created in *Pennoyer* v. *Neff*, I see no reason to rest jurisdiction on a fictional outgrowth of that system such as the existence of a consent statute, expressed or implied.[6]

I, therefore, would approach the minimum-contacts analysis differently than does the Court. Crucial to me is the fact that appellants[7] voluntarily associated themselves with the

[5] In fact, it is quite plausible that the Delaware Legislature never felt the need to assert direct jurisdiction over corporate managers precisely because the sequestration statute heretofore has served as a somewhat awkward but effective basis for achieving such personal jurisdiction. See, *e. g., Hughes Tool Co.* v. *Fawcett Publications, Inc.*, 290 A. 2d 693, 695 (Del. Ch. 1972): "Sequestration is most frequently resorted to in suits by stockholders against corporate directors in which recoveries are sought for the benefit of the corporation on the ground of claimed breaches of fiduciary duty on the part of directors."

[6] Admittedly, when one consents to suit in a forum, his expectation is enhanced that he may be haled into that State's courts. To this extent, I agree that consent may have bearing on the fairness of accepting jurisdiction. But whatever is the degree of personal expectation that is necessary to warrant jurisdiction should not depend on the formality of establishing a consent law. Indeed, if one's expectations are to carry such weight, then appellants here might be fairly charged with the understanding that Delaware would decide to protect its substantial interests through its own courts, for they certainly realized that in the past the sequestration law has been employed primarily as a means of securing the appearance of corporate officials in the State's courts. N. 5, *supra*. Even in the absence of such a statute, however, the close and special association between a state corporation and its managers should apprise the latter that the State may seek to offer a convenient forum for addressing claims of fiduciary breach of trust.

[7] Whether the directors of the out-of-state subsidiary should be amenable to suit in Delaware may raise additional questions. It may well require further investigation into such factors as the degree of independ-

State of Delaware, "invoking the benefits and protections of its laws," *Hanson* v. *Denckla,* 357 U. S., at 253; *International Shoe Co.* v. *Washington,* 326 U. S., at 319, by entering into a long-term and fragile relationship with one of its domestic corporations. They thereby elected to assume powers and to undertake responsibilities wholly derived from that State's rules and regulations, and to become eligible for those benefits that Delaware law makes available to its corporations' officials. *E. g.,* Del. Code Ann., Tit. 8, § 143 (1975) (interest-free loans); § 145 (1975 ed. and Supp. 1976) (indemnification). While it is possible that countervailing issues of judicial efficiency and the like might clearly favor a different forum, they do not appear on the meager record before us;[8] and, of course, we are concerned solely with "minimum" contacts, not the "best" contacts. I thus do not believe that it is unfair to insist that appellants make themselves available to suit in a competent forum that Delaware might create for vindication of its important public policies directly pertaining to appellants' fiduciary associations with the State.

---

ence in the operations of the two corporations, the interrelationship of the managers of parent and subsidiary in the actual conduct under challenge, and the reasonable expectations of the subsidiary directors that the parent State would take an interest in their behavior. Cf. *United States* v. *First Nat. City Bank,* 379 U. S. 378, 384 (1965). While the present record is not illuminating on these matters, it appears that all appellants acted largely in concert with respect to the alleged fiduciary misconduct, suggesting that overall jurisdiction might fairly rest in Delaware.

[8] And, of course, if a preferable forum exists elsewhere, a State that is constitutionally entitled to accept jurisdiction nonetheless remains free to arrange for the transfer of the litigation under the doctrine of *forum non conveniens.* See, *e. g., Broderick* v. *Rosner,* 294 U. S. 629, 643 (1935); *Gulf Oil Co.* v. *Gilbert,* 330 U. S. 501, 504 (1947).