FURNIVAL MACHINERY COMPANY

v.

JOSEPH T. BARTA ASSOCIATES, INC.

Civ. A. No. 78-1856.

United States District Court,
E. D. Pennsylvania.

May 29, 1979.

Robert E. Slota, Bryn Mawr, Pa., for plaintiff.

Robert K. Loesche, Philadelphia, Pa., for defendant.

MEMORANDUM

LUONGO, District Judge.

This is a diversity action for breach of warranties given in connection with the sale of a ten-passenger private airplane. Furnival Machinery Company (Furnival), which purchased the airplane in 1977, brought this action against Joseph T. Barta Associates, Inc. (Barta), which sold the airplane. Furnival effected service of process on Barta pursuant to the Pennsylvania "long-arm" statute. Fed.R.Civ.P. 4(d)(7). On August 4, 1978, Barta—a New York corporation—moved to dismiss the complaint for lack of personal jurisdiction. Fed.R.Civ.P. 12(b)(2). On August 22, 1978, I entered an order directing the parties to create a factual

record so that I could determine whether Barta was subject to suit in a Pennsylvania forum. Document No. 7. Although my order called for the parties to complete discovery within sixty days and file their briefs by November 15, 1978, their final written submissions were not filed until April of this year. The factual record is still not as complete as it might be, but I believe that it provides an adequate basis for resolution of Barta's motion. For the reasons hereafter stated, I conclude that Barta's motion should be denied.

■ This action was commenced shortly before the effective date of Pennsylvania's revised Judicial Code, and it is therefore governed by the prior "long-arm" statute, which was enacted in 1972. That statute authorizes service upon any foreign corporation that has "done any business in [Pennsylvania] without procuring a certificate of authority to do so," *id.* § 8302(a), and it defines "doing business" in subsection (a) of section 8309. Subsection (b) of that section also provides:

"In addition to the provisions of subsection (a) of this section the jurisdiction . . . of courts of the Commonwealth shall extend to all foreign corporations and the powers exercised by them to the fullest extent allowed under the Constitution of the United States."

42 Pa.Cons.Stat.Ann. § 8309(b) (Purdon Supp.1978).

As Judge Ditter has pointed out, section 8309(b)

"eliminates the need to engage in the type of dual-tiered analysis which has typically been used in deciding questions of personal jurisdiction. Instead of first determining whether a foreign corporation's contacts with the forum fall within the terms of the applicable statute, and, if so, then determining if the statute as so applied comports with due process, courts in Pennsylvania may now proceed directly to the constitutional issue."

*Inpaco v. McDonald's Corp.,* 413 F.Supp. 415, 418 (E.D.Pa.1978).

The constitutional issue here is whether Barta, a New York corporation, has suffi-

cient contact with Pennsylvania "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339 (1940)). In applying the *International Shoe* test, "the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present." *Kulko v. California Superior Court,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978) (quoting *Hanson v. Denckla,* 357 U.S. 235, 246, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). It is therefore necessary to recite in some detail the facts that appear on the present record.

According to the complaint, Furnival is a Delaware corporation with its principal place of business in Hatfield, Pennsylvania. Complaint (Document No. 1) ¶ 1. Barta, on the other hand, is a New York corporation "with its principal office and place of business at Hanger D, [Westchester] County Airport, White Plains, New York." *Id.* ¶ 2.

At some point in 1977, Thomas O'Malley, Furnival's pilot, learned that Barta wished to sell a used ten-passenger Beechcraft King-Air 100 aircraft. In late June or early July of that year, O'Malley made a telephone call from Pennsylvania to Barta's place of business in New York, and inquired about the airplane. This call "was paid for by Furnival." Wreath Affidavit (Document No. 8) ¶ 1. Barta, in response to the telephone call, mailed a specification sheet describing the airplane to Furnival at a post office box in Plymouth Meeting, Pennsylvania. *Id.* ¶ 3. After Furnival's president, Robert G. Thomson, reviewed the specifications, Furnival's board of directors "authorized the purchase of the subject aircraft and the trade-in of the company's then owned airplane, a Piper Navajo Chieftain." *Id.* ¶ 4.

In order to pursue this objective, representatives of Furnival communicated with Larry Byerly, the president of Byerly Aviation, Inc., and proposed a three-way trans-

action. Byerly Aviation, Inc. is an Illinois concern engaged in, *inter alia,* buying, repairing, and selling airplanes. Byerly Deposition (Document No. 13) at 2. Although neither Larry Byerly nor Byerly Aviation, Inc. is a party to this litigation, both figured prominently in the transaction that gave rise to this suit. Moreover, Larry Byerly's deposition is the only document of record that sheds any light on the details of the transaction through which Furnival eventually acquired the Beechcraft airplane.

Thomson, the president of Furnival, wanted certain work done on the Beechcraft airplane before Furnival acquired it. He believed that Larry Byerly's firm could do the work according to his specifications. Thomson also knew (through O'Malley) that Larry Byerly wanted to acquire Furnival's Navajo airplane. Thomson therefore asked Larry Byerly to put together a three-way transaction. In Byerly's words:

"Bob Thompson asked me to see if I could work something out where he could get the [Beechcraft] King Air with certain things done to it. He wanted a lot of extra stuff done to it and I would get that Navajo. In other words I'd kind of act like his agent and go in and say 'Here's the deal' and I would end up with the Navajo to help him purchase the airplane. My primary job there was to do his painting, his interior work, his flush toilet that he wanted put in the airplane and some radio work which we would be able to do and he knew it. And he knew I would do it to his specs and so he asked me if I would do that and I said that I would be happy to because that would get me my Navajo."

Byerly Deposition at 7–8.

Larry Byerly then made a telephone call to Thomas Tred Barta, vice-president of Barta, to arrange for an inspection of the Beechcraft airplane, which was then located in Bridgeport, Connecticut. It was either during this conversation or else during the visit to Bridgeport when Larry Byerly informed Thomas Tred Barta that he envisioned a three-way transaction. The following colloquy from Byerly's deposition reveals the substance of his statement:

"Q. Okay. Was it at one of those two times?

A. Yes. I remember talking to Tred [Barta] and told him about Furnival and that they were trading in a [Navajo] Chieftain on his [Beechcraft] King Air and he didn't know there was a trade-in involved.

Q. Did he indicate to you that he had been talking to O'Malley?

A. He had been talking to or somebody in his office has been talking to O'Malley and I said 'Yes, I know that and I know you're going to have to take in the Navaho and I want to buy the Navaho.' And Tred didn't know there was a trade-in at that point in time."

*Id.* 6–7.

Quite apart from Larry Byerly's statement, Tred Barta knew that Byerly Aviation did not deal in airplanes as expensive as the Beechcraft KingAir. *Id.* 35–36.

All four men then visited Bridgeport. The inspection of the Beechcraft airplane took about thirty minutes. During this time, O'Malley and Thomson (and perhaps Barta) climbed on board the airplane and examined it. O'Malley also inspected the log books for the aircraft.

Some time later, Byerly met with O'Malley and Thomson to discuss the transaction in more detail. Thomson had a specific price in mind. "He wanted to pay so much money and his Navaho for a King Air finished." *Id.* 9. When the three of them spoke to Tred Barta, though, they found that he was looking only at "how many dollars he was getting for his King Air." *Id.* The parties eventually agreed that Tred Barta would receive $436,000 for the Beechcraft KingAir through a three-party transaction.

This money all came, directly or indirectly, from Furnival. On July 22, Thomson of Furnival gave Byerly a company check for $20,000 as a deposit, which Larry Byerly then endorsed over to Tred Barta. When Barta's pilot delivered the Beechcraft King-Air to Byerly in August, Larry Byerly

gave the pilot a cashier's check for the balance of $416,000. That sum, too, came from Furnival. Thomson had wired $285,000 from a Pennsylvania bank to Byerly's bank in Illinois. He had also given Larry Byerly title to Furnival's Navajo Chieftain, and Larry Byerly then borrowed another $131,000 in Illinois, using that airplane as security. Tred Barta knew where the $436,000 had come from. *Id.* 12.

O'Malley—Furnival's pilot—repeatedly expressed concern over whether the King-Air's engines were in good condition. He wanted to do a "hot section," which is a substantial overhaul, on the engines. Tred Barta assured him, though, that this was unnecessary, because certain tests could be run to insure that the engines were developing full rated power. As a result of O'Malley's comments, a provision was inserted into the July 22 sales agreement between Barta and Byerly. This provision read: "All ground rules and tests will be given to Furnival Machinery immediately upon run to evaluate." Exhibit P–3 to Byerly Deposition. The parties agreed that if these tests showed that the engines were not developing full power, then the $20,000 deposit—which passed from Furnival to Byerly to Barta—would be refunded to Furnival. Byerly Deposition 24.

For similar reasons, the parties agreed verbally that on the date of transfer, Barta's pilot would fly the Beechcraft KingAir out to Wings Field, in Pennsylvania, to pick up O'Malley, and then fly back to Peoria, Illinois, where Byerly Aviation, Inc. is located. This would enable O'Malley to observe the engines' performance during the flight. The airplane would then remain in Peoria so that Byerly could perform the work that Thomson had specified, and O'Malley would return to Pennsylvania by other means. As it happened, however, Barta was unable to obtain the airplane by the agreed-upon date, and O'Malley was unavailable for the trip to Peoria once Barta had the airplane ready. The parties then agreed that Barta would simply deliver the airplane directly to Byerly in Peoria. Because O'Malley was thus unable to "accept" the airplane in person, Tred Barta told Larry Byerly that he would correct any deficiencies in the airplane that became apparent when O'Malley finally received it in Pennsylvania.

Byerly and Furnival had earlier executed a separate agreement governing the "exchange" of Furnival's Navajo Chieftain for the refurbished Beechcraft KingAir. Exhibit P–2 to Byerly Deposition. This agreement called for Byerly to deliver the KingAir to Furnival at Wings Field, in Pennsylvania. After Byerly completed its work on the airplane, however, O'Malley came to Peoria and picked up the airplane there. Byerly Deposition 16–17.

O'Malley and Thomson used the airplane on a trip to South Carolina shortly thereafter, and found numerous deficiencies. O'Malley and Larry Byerly met with Tred Barta in New York, in order to discuss these problems. The following colloquy from Byerly's deposition reflects the thrust of that discussion:

"Q. Okay. And describe for us, would you please, the substance of that conversation.

A. Well, Tom [O'Malley] had gotten a bill from Stevens Beechcraft [in South Carolina] that amounted to something like nineteen or twenty thousand dollars, and of course he wanted to get as much of that as he could from Tred. And Tred said that he would help, you know, he would help. But he didn't think he'd pay that kind of money to fix a used airplane.

Q. Okay. But did he essentially acknowledge that it was his responsibility to Furnival to correct certain of these?

A. Some of it.

Q. Certain of these deficiencies—

A. Right, because he said he had previously."

Byerly Deposition at 19.

Furnival relies on the facts recited above as support for its contention that Barta is subject to the jurisdiction of a Pennsylvania forum. The record clearly shows that Barta had had no other contact with the Commonwealth of Pennsylvania. In particular, Barta does not have a certificate of authority to do business in Pennsylvania, nor does

it do any "direct business" in Pennsylvania. Barta Affidavit (Exhibit to Document No. 6). Barta has no office in Pennsylvania, it employs no salesmen in Pennsylvania, and it owns no property in Pennsylvania. *Id.*

In my view, however, Barta's participation in the three-party transaction described above constitutes sufficient contact with the Commonwealth of Pennsylvania to support the assertion of jurisdiction over Barta in this lawsuit. The record discloses that Barta delivered its Beechcraft KingAir to Byerly Aviation, Inc. in Illinois, knowing full well that Byerly would transfer the airplane to a Pennsylvania concern once it completed the "cosmetic" refurbishing work that Furnival desired. This is *not* a case where the defendant, having sold an article to one customer, may fairly claim surprise when the article later turns up in a third state. *See Johnson v. Helicopter & Airplane Servs. Corp.,* 389 F.Supp. 509, 520 (D.Md.1974) (helicopter sold in New York to a California corporation; seller "had no notice or expectation that the product would ultimately be sold to a Maryland user"). Nor is this a case where the defendant simply had some reason to believe that its customer *might* resell to an out-of-state concern. *See generally Kerrigan v. Clarke Gravely Corp.,* 71 F.R.D. 480, 485–87 (M.D. Pa.1975) (discussing the "foreseeable use" test); *Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961). Barta knew at a relatively early point in this transaction that Furnival wanted the KingAir, and that Byerly would exchange airplanes with Furnival as part of the three-way arrangement. Indeed, Barta accepted $436,000, which it knew had come from Furnival, as the full purchase price of its KingAir. By taking part in this transaction, knowing that its airplane would shortly wind up in Pennsylvania, Barta "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla,* 357 U.S. 235, 254, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). Barta also had "fair warning" that its activity might subject it to the jurisdiction of a Pennsylvania court. *Shaffer v. Heitner,* 433 U.S. 186, 218, 97

S.Ct. 2569, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring in the judgment). Under the circumstances, I cannot accept Barta's contention that the maintenance of this action in a Pennsylvania forum offends traditional notions of fair play and substantial justice.

Barta advances several arguments in support of its motion, only two of which merit discussion here. First, Barta objects to a jurisdictional standard under which "a small company such as Barta Associates would be subject to suit in any state in which one of its purchasers happens to resell a Barta airplane." Brief in Support of Motion to Dismiss (Document No. 9) at 13–14. As I understand the argument, Barta urges that although a *manufacturer* or a *distributor* of goods is properly subject to suit in another state when its goods foreseeably enter that state, a "small company" such as Barta should be treated differently. Whatever force this position may have in the abstract, it cannot defeat the assumption of jurisdiction here. For one thing, the factual record does not reveal whether Barta is a small company or a large company, nor does it reveal the nature of Barta's business. More importantly, however, I do not hold Barta amenable to suit in Pennsylvania simply because Byerly "happened" to resell a Barta airplane to a Pennsylvania concern. The facts recited earlier show that Barta *knew* its airplane would wind up in Pennsylvania, and that Barta took part in the transaction with full knowledge that Furnival was the "ultimate" purchaser. Thus, this is not a case where a "small company" sells to one customer, who in turn "happens" to resell to another customer in a third state, and I therefore need not consider what rules would govern such a case.

Barta's second argument is somewhat more substantial. To quote from Barta's brief:

"The distinction that should be drawn here is between doing business with a Pennsylvania corporation and doing business in Pennsylvania. It may well be true that, as a result of the inspection in Connecticut and statements made by Mr.

Byerly, Barta Associates were made aware that the airplane in question would ultimately be owned by a Pennsylvania company. But their actual business was conducted with an Illinois corporation. The fact that this Illinois corporation was ultimately working to serve the interests of a Pennsylvania customer does not mean that Barta Associates conducted business in Pennsylvania. A fair analogy would be where a foreign supplier deals with a non-Pennsylvania subsidiary of a Pennsylvania corporation. The supplier may well be aware that the subsidiary is purchasing goods with the interests of its parent in mind, but if the subsidiary has independently approached the supplier, it defies logic to conclude that the supplier has somehow 'chosen' to conduct business *in* Pennsylvania. It may indirectly be doing business with a Pennsylvania corporation, but that business is actually conducted elsewhere."

Supplemental Brief in Support of Motion to Dismiss (Document No. 14) at 5 (emphasis in original).

Certainly, as Barta points out, a foreign corporation that indirectly does business with a Pennsylvania corporation is not necessarily doing business *in* Pennsylvania. The issue here, though, is not whether Barta was doing business in Pennsylvania, but whether Barta had sufficient *contact* with Pennsylvania so that it may fairly be required to defend this action in a Pennsylvania forum. I have already stated that Barta's contacts with Pennsylvania were sufficient, in my view, to support the assumption of jurisdiction here.

For the reasons stated above, I shall enter an order denying Barta's motion to dismiss the complaint.