511 So.2d 1173 (1987)
Julie Bartlett Morrison GAY
v.
Lord Harriss MORRISON, Jr.
Nos. CA-7014, CA-7340.
Court of Appeal of Louisiana, Fourth Circuit.
July 8, 1987.
Rehearing Denied September 24, 1987.
*1174 Dudley D. Flanders, Bennett Wolff, Flanders & Flanders, New Orleans, for plaintiff.
D. Douglas Howard, Jr., Leslie A. Bonin, New Orleans, for defendant.
Before BARRY, KLEES and BYRNES, JJ.
BARRY, Judge.
A mother appeals two judgments (which we consolidated) which held that the trial court lacks jurisdiction to modify (reverse) a New York custody decree, and the dismissal of her rule for contempt, attorney fees and make-up visitation. The matter was submitted on the pleadings and stipulations. The issues are whether Louisiana has jurisdiction to modify or enforce the decree.
Mr. and Mrs. Morrison were married in New Orleans in 1965 and moved to New York in 1967 where their sons, Harriss and Julian, were born in 1972 and 1973. In 1974 Mr. Morrison's employment took the family to Brazil. The parents separated in 1977 and the mother eventually returned to New York. In 1978 a Brazilian consent separation judgment awarded custody of both children to the father. In 1979 the mother sued for sole custody in New York and after a lengthy hearing the trial judge ruled that the father have permanent custody.[1] A 1981 New York judgment provides that the mother "shall have annual visitation with the children within the continental United States commencing on June 15th of each year and continuing through July 15th of each year ...".
The mother moved to New Orleans in 1982 and obtained a divorce in 1984. The boys visited their mother in New Orleans from 1982 through 1985 and during one Christmas season. Both parents remarried and the father and his sons continue to live in Sao Paulo, Brazil.
On May 21,1986 the mother filed for sole custody in New Orleans. The father responded with exceptions as to subject matter jurisdiction and forum non conveniens. The court ruled that it lacked jurisdiction, reasoning "there are not significant connection [sic] with the State of Louisiana." Writs to this court (C-6328, October 3, 1986) and our Supreme Court (86-CC-2079, December 5, 1986) were denied.
Four months later the mother filed a rule alleging the father refused to permit the summer visitation in 1986, and prayed for contempt and make-up visitation, plus attorney fees. The father's exceptions of insufficiency of service of process, lack of jurisdiction over the person and lack of subject matter jurisdiction were maintained.
Our trial court stated:
It is presumptous [sic] to think that only the Courts of the United States can adequately determine custody in the best interest of American children who have resided outside of the United States for the past 12 years.
Only one parent lives in Louisiana. The children have never lived in Louisiana and the maximum amount of evidence concerning the children is not availabe [sic] in Louisiana but in Brazil ...
Therefore because Brazil is the home of these children and has been for 12 years, one parent lives in Brazil; there is no evidence to indicate that the best interest of the children will be served by having a Louisiana court to determine custody; there has [sic] been no allegations that the litigants were ever denied due process in Brazil, this Court declines jurisdiction.
The mother contends the trial court erred by determining that Louisiana *1175 lacks jurisdiction to modify the New York decree, and by refusing to enforce visitation. The father argues that Louisiana does not have the requisite connections to establish jurisdiction under the Uniform Child Custody Jurisdiction Act and claims that either Brazil or New York is the proper forum.
The Uniform Child Custody Jurisdiction Act, La.R.S. 13:1700 et seq., was promulgated to avoid jurisdictional competition and conflict, promote interstate cooperation, litigate custody where the child and family have the closest connections and where significant evidence concerning the child is most readily available, discourage continuing conflict over custody, deter abductions and unilateral removals of children, avoid relitigation of another state's custody rulings, and promote the exchange of information and mutual assistance between different states. Peery v. Peery, 453 So.2d 635 (La.App. 2d Cir.1984).
In determining whether Louisiana courts have jurisdiction, it is crucial that each of the multi-faceted components of the Act be construed to promote its general purposes. Ingram v. Ingram, 463 So.2d 932 (La.App. 2d Cir.1985). Our primary concern, as always, is the best interests of the child. Schroth v. Schroth, 449 So.2d 640 (La.App. 4th Cir.1984).
After a court renders a custody decree, there are limited exceptions which permit another state to exercise jurisdiction to modify that judgment. Specifically, the court which rendered the original decree must no longer have jurisdiction and the Louisiana court must meet the jurisdictional requisites of R.S. 13:1702. Miller v. Miller, 463 So.2d 939 (La.App. 2d Cir.1985).
R.S. 13:1702 provides:
A. A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:
(1) This state (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or
(2) It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or
(3) The child is physically present in this state and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or
(4)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with Paragraphs (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.
B. Except under Paragraphs (3) and (4) of Subsection A, physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.
C. Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody.
It is uncontested that Louisiana is not the boys' "home state", R.S. 13:1702(A)(1). The children are not physically in Louisiana and there is no emergency. R.S. 13:1702(A)(3). The mother's brief relies on (A)(2) and her counsel included (A)(4) during argument.
There is no evidence to come under R.S. 13:1702(A)(2)(i) and (ii). The mother and *1176 her family live in New Orleans, but it is doubtful whether that, alone, is a "significant connection with this state." However, these facts are insufficient to comply with (ii) because substantial evidence concerning the children's "present or future" welfare would be found where they were raised from infancy, i.e., in Brazil, not in Louisiana.
As for 13:1702(A)(4), it appears no other state has jurisdiction under the requisites of (1), (2), or (3); however, neither New York (the last custody forum) nor Brazil (the original forum) has declined jurisdiction. More importantly, it is not in the best interests of these teenage boys for Louisiana to assume their custody jurisdiction. Their mother's primary argument, that their alleged lack of exposure to American culture and stateside education is detrimental, does not support a "best interest" claim. They have lived with their father since birth, they are now 15 and 14 years old and have lived in Brazil the past 13 years. There is no evidentiary hint (as to an inferior Brazilian lifestyle) why their custody should be changed.
The court has no basis to assume custody jurisdiction under the Uniform Child Custody Jurisdiction Act. There is no evidence that the father absconded or secreted the children. The Parental Kidnapping Prevention Act is inapplicable.[2]
The mother also argues that Brazil is not a "state" under the P.K.P.A. or U.C.C.J.A., hence, it cannot be the state with the most significant connections. We disagree. To entertain that narrow interpretation would require that we ignore the status of the Brazilian court to which the mother willingly submitted her consent to the original custody decree.
The mother alternatively claims that "if the court can't modify the New York decision of custody, surely the court can enforce the judgment" pursuant to R.S. 13:1700(A)(7)[3] and R.S. 13:17124,[4] i.e., to grant full faith and credit. The father argues that Louisiana lacks personal jurisdiction.
Our position on personal jurisdiction in custody litigation was expressed in Martinez v. Reed, 490 So.2d 303 (La.App. 4th Cir.1986) at footnote 1, page 306:
Although we recognize that there is some disagreement as to whether custody adjudication under the UCCJA comes within the "status exception" of Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), we feel the better view is that a Louisiana court may adjudicate custody under La.R.S. 13:1700 et seq. without acquiring personal jurisdiction over an absent party. Once the subject matter jurisdiction of the Louisiana court has been established, the resulting custody decree is binding if the absent party has been given notice and opportunity to be heard as provided by La.R.S. 13:1704.
That same reasoning would apply to enforcement of decreed visitation rights. The trial judge erred by maintaining the father's exception based on lack of personal jurisdiction.
The mother argues that the father should not be allowed to "repudiate" the visitation rights granted by the New York decree. She claims that this court previously recognized the validity of the New *1177 York decree in writ C-6328 which was denied without comment. However, our foregoing comments expressly recognize that decree as still in effect.
We cannot say that New York no longer has jurisdiction. Certainly the Brazilian court, where the father and two boys live and which clearly has the most significant connections, has jurisdiction. More importantly, Louisiana does not have jurisdiction for the reasons outlined in the denial to modify.
Our concern is that these teenagers maintain maternal contact. Neither parent claims that custody by the other is or would be detrimental. To the contrary, the mother and father appear to be loving parents who are interested in their children's welfare. It would be in the best interests of these boys to continue visitations with their mother. Personal disputes between the parents and their legal maneuvers can only be detrimental to their children's welfare.
The district court judgment is affirmed.
AFFIRMED.

ADDENDUM

EXHIBIT A

Court's Decision
(After recess, and at 6:07 p.m. the further and following proceedings were had in open court:)
THE COURT: Be seated. The Court will now announce its decision in Morrison against Morrison, in this proceeding, commenced under the Domestic Relations Law, Section 240, by petition and order to show cause seeking the custody of two infant children. The petitioner is the mother and respondent is the father of the children.
The respondent, who is born in Georgia, met the petitioner, who is born in New Orleans, while they were attending college at Tulane University, married in 1965 while at college, and after his graduation in 1966 he enrolled at Columbia University Graduate School of Business Administration and they moved to New York City.
In 1968 he commenced full-time employment in a brokerage firm in New York and remained there until 1972, when he took a job in Alexandria, Virginia, and thereafter here in New York City.
The first child was born in 1972 and the second in 1973.
In 1974 he had an opportunity to work at a well paying job in Sao Paulo, Brazil, which is the largest city in Brazil, and the family moved there in that year.
Although during the years since 1974 he has changed jobs, the salary is high and enabled the family to live very well.
There had been various marital differences, and at about the end of 1977 petitioner decided to leave the marital home. She actually left on May 18th, 1978 and traveled to New York City. Her visit there was a temporary one. Her airline ticket to New York was a roundtrip ticket, and when she obtained employment in New York on a part-time basis, she advised her employer that she intended to return to Brazil.
In July of 1978 the respondent brought the children to New York for a visit with the petitioner and returned to Sao Paulo with them after some weeks.
In December of 1978 petitioner returned to Brazil utilizing the return half of the airline ticket she had obtained before leaving Brazil.
She remained in Brazil until May of 1979 and then flew to Colombia to visit her sister, whose husband had just passed away. She went from there to New York with her sister and after three weeks went to New Orleans to visit her parents on the way to returning to Sao Paulo.
At that time however respondent telephoned to her and told her he was intending to bring the children to the United States for a visit.
The petitioner decided to wait in New York and, without advising respondent, planned legal proceedings to obtain custody of the children here.
The children arrived around or about June 25th of 1979 with respondent, who gave them for a visit to the petitioner.
*1178 Some two days later the petitioner verified her petition and obtained the order to show cause and caused it sometime thereafter to be served on the respondent.
Although the respondent is employed in Brazil, he has remained here to oppose the proceedings. Hearings have been held on September 28, October 3rd, 23rd, 24th, 25th, 30th, 31st, November 1st, 2nd, 8th and 9th. Testimony was taken from respondent petitioner, respondent, and other witnesses. On petitioner's part the testimony was largely directed to attempts to prove, through innuendo and argument, the unsavory character of the respondent. Much was hearsay and conclusory, although some parts of it partook of the relation of admissions by respondent to the petitioner during the course of their marriage, which is not unusual in marital disputes.
Aside from a claim of some minor youthful peccadilloes, there was no support in the evidence for the claim of criminal conduct, including bribery, kickbacks, alleged pending indictments, and other financial operations of the respondent. In fact, petitioner claims to have known of these at the time, seems to have accepted the benefits of them, if in fact they ever took place, without qualms.
Her other bases for relief were that the children, since they are citizens of this country, must be brought up only under the American flag, in American schools, and with access only to the way of life of the United States; andwhich the Court findsthat she has a deep and abiding love and affection for her children and they love her.
The respondent, then testifying, although answering questions very carefully, was not as candid and full in his responses as the Court deems appropriate, particularly in matters involving custody.
On the other hand, the petitioner's testimony was, in the opinion of the Court, tailored in many instances to support her claims.
During the spring of 1978, when petitioner decided to separate from respondent and leave Brazil for some months, it was agreed between them that the children were to remain with the respondent in Sao Paulo and to continue their education and to live there.
On May 18 of 1978 a separation agreement was drawn up by a firm of lawyers who represented both sides. This agreement gave custody of the children to respondent and made certain financial provisions for petitioner. Although, under the circumstances of the agreement, the agreement was one that under New York law could have been set aside if it did not represent the intentions of the parties in any respect, it is clear from the evidence that it did in fact memorialize their intentions at that time and their understanding at the time it was made.
Thereafter the agreement was incorporated in a decree of a court of competent jurisdiction in Sao Paulo, but only after the judge presiding had assured himself that it was in fact acceptable to both parties.
Petitioner's claims of bribery of the judge and of her inability to understand the language are, in the opinion of the Court, fabricated.
Petitioner immediately left Brazil and came to New York. Her job-seeking efforts were not successful; she apparently does not have the capacity to obtain a job sufficient to maintain herself in the style to which she had been accustomed while living in Brazil, and it would be illegal, as the Court finds from the evidence, for funds to be sent from Brazil by any one person to her in the amount of more than three hundred dollars per month.
The children were brought to New York by respondent in the summer of 1978 and then returned to Brazil. It is significant that at that time petitioner made no effort to keep the children here, to take them away from the Brazilian environment which she now claims to be so dangerous and harmful to them. If these claims were true and if she had cared at that time, that action would have been taken, in the opinion of the Court, at that time.
In December of 1978 she returned to Sao Paulo after having seen a lawyer here, a *1179 Mr. Robert Ferrari, and having had drawn up a proposal in which she intended to redefine the relationship, both financial and custodial, between the parties.
Although the written proposals were not shown to the Court it was testified to by respondent, and admitted by petitioner, that she then intended, or that the agreement then provided, or tentative agreement, that the children would remain in respondent's custody in Brazil for a further five years, at which time they were to return to the United States for further education.
I think I'm wrong; I think it was a further two years.
MR. GOODSTEIN: Two years.
MR. MORRISON: Four.
THE COURT: (cont'g) In the intervening months in Brazil, petitioner retained her own attorney and, after some negotiations, the parties amended the original agreement, which was never repudiated by the petitioner; and the children remained in Sao Paulo while petitioner, in May, returned to New York.
A letter written by the petitioner clearly shows her intent to leave the children in Brazil and her own belief that that was in their best interest at that time.
In December of 1978 the respondent brought into his home, after a ceremony apparently common in Brazil where divorce laws are very strict, a young lady. She is a graduate child psychologist studying for a PhD at this time. She is sensitive to the needs of the children, and although her English ability is limited, she, together with respondent, adequately cares for the children.
Particularly revealing on the issue of intent of the parties and the knowledge by petitioner of the custody in the respondent was her statement at the end of this trial that in January of 1979 she said to respondent, during the negotiations, if he was to have custody, then where was her money.
The respondent has adequate monies with which to support the children in Brazil. However, he cannot remit more than $300 per month under the exchange regulations of Brazil for their support and in New York the petitioner would not have enough money to raise them as they should and could be raised, and although she expressed her ability to raise money from her family and friends and to get a job, this is highly speculative and somewhat improbable.
The Court concludes from her appearance and testimony that one of her motivations for bringing this proceeding, albeit not the primary one, was to obtain sufficient support monies for the children so that she might somewhat benefit from them.
There is however no doubt in the mind of the Court that she does love the children and they do love her. There is no claim that respondent is not a fit parent. Neither is petitioner unfit. But on balance, the best interests of the children require that they remain in respondent's custody.
To be discouraged are sudden recent attempts to nullify custodial agreements where there has been no real change in circumstances, according to the Court of Appeals in 43 NY2d at Page 242 in Matter of Nehra.
Under all these circumstances of the case, therefore, custody is given to the respondent. There must be adequate provisions for the visitation by the children in New York with their mother, or at her choice, and at the expense of the respondent in lieu of visitation in New York, in Brazil.
Respondent, I take it, consents to this? Mr. Malone?
MR. MALONE: Sir?
THE COURT: Respondent consents to visitation in New York?
MR. MALONE: Yes.
THE COURT: And he will agree not to oppose it in the Brazilian court?
MR. MALONE: He will agree not to
THE COURT: not to oppose visitation in New York in any Brazilian court.
MR. MALONE: No. We want these children to go with their mother, too, as *1180 well as their father; but you have got to get some protection so we don't have the same problem in the future as we've had.
THE COURT: (cont'g) It would not be in the best interests of the children for this to occur; for if it does, if for any reason the respondent does not supply adequate visitation to the mother, the petitioner may reapply to this Court for redetermination of this agreement at the foot of the decree.
This Court, gentlemen, is of the opinion that this determination will be respected by a court in Brazil, just as this Court would, by comity, respect a judgment of the Brazilian court.
So the respondent may have custody. The proceeding is dismissed, and you will settle an order on this, at your convenience, gentlemen.
MR. MALONE: Now
THE COURT: I must tell you, it's a very difficult case. The parents both love the children; the children love both parents. The kids are very nice kids, growing up well. It's not good for them to be pawns going back and forth.
I think once this issue is resolved, the kids undoubtedly will and should be schooled in schools in their latest schooling years in the United States, whether New York or some other city, it doesn't matter. I have no doubt that is in their best interests and that should happen.
It's obviously unfortunate, as Mr. Goodstein says, that the father is not here in New York where he can be with the children. But life does separate families and it happens that way.
All right. Now that's the decision of the Court.
MR. MALONE: Now when may Mr. Morrison have these children?
THE COURT: Oh, the children are in my chambers now.
MR. MALONE: May he take them now?
MR. GOODSTEIN: Your Honor.
MRS. MORRISON: I can't see my children again?
THE COURT: Of course you may see them.
MRS. MORRISON: A year from now?
MR. GOODSTEIN: Your Honor, I am applying at this time for a stay for three days because there is a holiday, and I am asking your Honor for a stay so I can take this to the Appellate Division and get a stay.
THE COURT: That application is denied.
MR. GOODSTEIN: My application is denied?
THE COURT: Denied, yes.
MR. GOODSTEIN: May I have a stay of twenty-four hours?
THE COURT: No. No, the Court is aware of the circumstances, all the circumstances in this case, and the stay is denied. Not at this time.
Mr. Morrison is given custody.
MR. MALONE: May I deliver to the father his passport and the passports of the two children, which I hold in my hand?
THE COURT: You may.
MR. GOODSTEIN: Your Honor, if those children are taken out of the country on Sunday, is that what you are permitting by allowing those passports to be turned over?
THE COURT: They are entitled to be with the father and they are entitled to be in Brazil; yes.
MR. GOODSTEIN: Before a judgment is signed, before an order is signed?
THE COURT: Yes. He is granted custody.
MR. GOODSTEIN: Don't you think we should have a judgment and an order?
THE COURT: I will sign it now if you like.
MR. MALONE: Very well.
THE COURT: All right.
MR. MALONE: Now you've got to make some arrangements.
THE COURT: The chambers are at 563. Will you take them up there.
*1181 (Hearing concluded at 6:25 p.m.) Certified true and correct.

Official Court Reporter
NOTES
[1] The New York trial judge's oral reasons explain in explicit detail why "permanent" custody was awarded to Mr. Morrison, and are attached as an Addendum.
[2] We note Miller v. Miller, supra, where the Second Circuit considered that the mother and child no longer lived in Florida, the father and paternal grandparents lived in Louisiana, and the child had not lived in Louisiana for over four years. The court held that Louisiana was an inconvenient forum to exercise jurisdiction. Miller is very similar, except that these two children have never lived in Louisiana.
[3] R.S. 13:1700(A)(7) provides:

A. The general purposes of this Part are to:
7. Facilitate the enforcement of custody decrees of other states.
[4] R.S. 13:1712 specifies:

The courts of this state shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this Part or which was made under factual circumstances meeting the jurisdictional standards of the Part, so long as this decree has not been modified in accordance with jurisdictional standards substantially similar to those of this Part.