[— NYS2d —]

In the Matter of the Estate of Oscar Obregon, Deceased. Joel S. Stern, as Ancillary Administrator, Respondent; Morgan Stanley Group, Inc., et al., Appellants.

First Department, April 3, 1997

## APPEARANCES OF COUNSEL

*T. Randolph Harris* of counsel *(Jodi R. Lustgarten* on the brief; *Davidson, Dawson & Clark,* attorneys), for Morgan Stanley Group, Inc., appellant.

*Eugene F. Farabaugh* of counsel *(Frederick M. Sembler* on the brief; *Milbank, Tweed, Hadley & McCloy,* attorneys), for Barclays Bank, appellant.

*Joel S. Stern* of counsel *(Stern, Wiener & Levy, L. L. P.,* attorneys), respondent *pro se.*

## OPINION OF THE COURT

NARDELLI, J.

In this case, we deal with the jurisdiction of the Surrogate's Court to adjudicate with respect to properties of nondomiciliaries of the State of New York which are located outside the State. While the facts herein may justify further investigation by the Mexican administrator of decedent's estate into the financial dealings of this Mexican domiciliary in other venues, the small bank account he had in this State and the transfer of monies through financial institutions in this State is insufficient under the circumstances to confer jurisdiction over foreign bank accounts and trusts outside this State to the Surrogate's Court.

In June of 1988, the decedent Oscar Obregon, a domiciliary of Mexico with residences in Texas and New York, contacted a friend Eugene Gonzalez, then employed by Morgan Stanley International in New York, for investment advice. Gonzalez introduced Obregon to Michael Cowan, an investment manager at Morgan Stanley International in London and, thereafter, Obregon opened an account with Morgan Stanley in London which was to be governed by English law and subject to the exclusive jurisdiction of the United Kingdom's courts. Obregon deposited monies to the account in the total amount of $1,453,338.50 through the Mellon Bank in New York where Morgan Stanley International of London maintained an account. Obregon confirmed a procedure transmitted by Gonzalez whereby account statements would be sent to his New York apartment and to Gonzalez and he returned to Gonzalez an executed "Certificate of Foreign Status" in which he indicated that he was *not* a resident alien of the United States. Thereafter, Obregon and Cowan had regular monthly telephone and written communications about the account regarding the investments, returns and portfolio values. Gonzalez was not

involved in managing Obregon's account and all instructions regarding it came from Obregon, although occasionally Gonzalez would forward instructions from Obregon to Cowan in London. Up until the end of 1989 or the beginning of 1990, Obregon had designated his son Oscar, born of his marriage, as the beneficiary of his London account. At that time, he contacted Gonzalez, who was now employed with Barclays Bank, said he needed estate planning and asked for a recommendation. He told Gonzalez that he wanted to use the money in the account to provide for another son, Christian, who was living in Canada. Gonzalez referred Obregon to a trust officer at Barclays in Miami named Nelson Ramirez. In either February or March 1990, Obregon contacted Ramirez and told him he was interested in establishing an off-shore trust. Ramirez described the types of trusts Obregon could establish in the Cayman Islands with a Barclays subsidiary, Barclays Private Bank and Trust (Cayman) Limited (Private Bank). In a number of subsequent telephone conversations, Ramirez and Obregon discussed the details of establishing a discretionary inter vivos trust in the Cayman Islands, and Ramirez got in touch with Kevin Brown, the Deputy Manager of Private Bank, to inform him of Obregon's desire to establish a trust in the Cayman Islands to hold some of his nonMexican assets (i.e., the monies held in the Morgan Stanley account in London). Obregon then executed a letter of wishes directed to Private Bank, a nonbinding instruction under the law of the Caymans given to assist trustees of discretionary trusts. Obregon also informed Cowan that he intended to transfer his assets being managed in his Morgan Stanley account in London to a trust being created with Private Bank. On April 19, 1990, the day before his death, Obregon executed the letter of wishes and also signed an asset transfer letter instructing Morgan Stanley in London to transfer the monies in his account to Private Bank to be held in the "Faygate Trust". On that same day, Obregon faxed copies of both letters to Ramirez in Miami and sent the originals to Ramirez by courier. Obregon telephoned Ramirez on April 19 to confirm that he had received the faxed copies. Private Bank had executed the declaration of trust which established the Faygate Trust by this time. Obregon also telephoned Cowan in London the same day to advise him the Trust had been established and that he (Obregon) had executed an asset transfer letter and that Cowan should immediately transfer all the assets in the London account to Private Bank as trustee of the Faygate Trust. Obregon committed suicide by jumping

from a hospital window on April 20, 1990, in Houston. At the time of his death, he was a Mexican domiciliary residing in Texas and only had a bank account in New York City of somewhat over $1,000. From April 19, 1990 until the transfer of the value of the trust assets by Morgan Stanley-London to Private Bank, Morgan Stanley-London held the assets in London in trust for Faygate Trust, and on June 14, 1990, Private Bank and Morgan Stanley-London entered into a written agreement whereby Morgan Stanley-London agreed to manage the assets of the Faygate Trust on behalf of the Trustee. Thereafter, at the direction of Private Bank, Morgan Stanley-London liquidated the Trust assets it had been managing in London and transferred the proceeds to Private Bank, as the Trustee of Faygate Trust. This was done by the purchase by Morgan. Stanley-London of a cashier's check drawn on Citibank, N. A. in New York, made payable to Private Bank and transmitted to Private Bank in the Cayman Islands.

Manuel Reyero Conejo (Reyero), the husband of Obregon's former wife and stepfather of Oscar, was the Mexican administrator of Obregon's estate and made inquiries as to the transferred assets. On April 2, 1991, Reyero petitioned the Surrogate's Court in New York seeking ancillary letters of administration, alleging that the estate's only New York asset was a bank account with a balance under $1,500, but that the purpose in obtaining ancillary letters was to trace the assets transferred from the account at Morgan Stanley in London to the Private Bank in the Cayman Islands. Upon the request of Reyero, his attorney, Joel Stern, was appointed ancillary administrator on May 16, 1991. The Surrogate's Court, in response to Stern's request, ordered discovery and Gonzalez, Ramirez and Cowan, who had been voluntarily produced by their employers, were deposed.

Thereafter, the ancillary administrator sought further discovery and also an order directing Barclays, Private Bank, Morgan Stanley and Morgan Stanley-London to turn over to him an amount equal to the trust assets as of April 19, 1990, the day prior to Obregon's death. Barclays and Morgan Stanley moved to dismiss the petition for lack of subject matter jurisdiction or, alternatively, on the ground of forum non conveniens. The Surrogate's Court denied the motions to dismiss.

Initially, we note that lack of personal jurisdiction is raised only by Barclays Private Bank and Trust (Cayman) Limited. However, while in personam jurisdiction is uncontested by Barclays and Morgan Stanley, the court's *right* to assert

personal jurisdiction is limited by the subject matter jurisdiction conferred upon the Surrogate's Court by our State Constitution and statute. Thus, the Constitution of the State of New York, in article VI (12 [d]), states, in pertinent part: "The surrogate's court shall have jurisdiction over all actions and proceedings relating to the affairs of decedents, probate of wills, administration of estates and actions and proceedings arising thereunder or pertaining thereto, guardianship of the property of minors, and such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law."

The Legislature, with respect to jurisdiction over nondomiciliaries of New York, has recognized jurisdiction "over the estate of any non-domiciliary decedent who leaves property in the state" (SCPA 206 [1]). However, other than the funds in the New York bank account maintained by Obregon that served as the predicate for the appointment of the ancillary administrator, the administrator and the Surrogate's Court lacked subject matter jurisdiction over any of Obregon's assets which were located outside the State. Consequently, the Surrogate's Court should have granted the motions of Barclay and Morgan Stanley and dismissed this proceeding.

"Letters testamentary are issued for two reasons. They may be issued at the place of the testator's domicile, the jurisdiction to issue them being found in the fact of the domicile. Such letters are known as domiciliary letters. Or they may be issued at any place wherein personal property of the testator is found, the jurisdiction to issue them being found in the *situs* of the property to be administered. Such letters are known as ancillary letters, and they are none the less ancillary because no letters testamentary may have been issued in the jurisdiction of the domicile. (18 Cyc. 1222 and notes.) The ancillary administration is not dependent upon the domiciliary, but each is distinct and independent within the limits of its exclusive authority. Strictly speaking, an executor or administrator, whether domiciliary or ancillary, has as matter of right no extraterritorial authority; but in the case of a domiciliary executor it is established by comity between States and nations (and in some States by statute) that while no one beyond the jurisdiction of his appointment is bound to recognize him, yet, that persons outside the jurisdiction who deal with him will be protected at least until a demand is made upon them by a local executor. This recognition of the title of a domiciliary executor outside the jurisdiction of his appointment rests upon the rule

of law that the *situs* of personal property is deemed to be at the domicile of the testator, and that the courts of the domicile have assumed jurisdiction over it by the issue of the letters testamentary.

*"The rule as to the authority of an ancillary executor is quite different. The jurisdiction to appoint him rests upon the fact that the actual situs of the testator's personal estate is within the State or county issuing the ancillary letters, and it is only over such property that the court issuing the letters has assumed jurisdiction. The authority of the ancillary executor is, therefore, strictly limited to personal property within the jurisdiction of his appointment, that is to say, to property having a situs within that jurisdiction, and this is the limit of plaintiff's authority, since his appointment is ancillary and not domiciliary."* (*Lockwood v United States Steel Corp.*, 153 App Div 655, 659-660, *revd on other grounds* 209 NY 375 [emphasis added].)

Justice Proskauer of this Court has best explained the authority of the ancillary administrator as being one quasi in rem in nature, which limits it to property actually located within the jurisdiction: "A proceeding for ancillary administration is, however, not strictly a proceeding *in rem*. Although it has been said that a proceeding to probate a will is a proceeding *in rem* 'in form and substance, upon the will itself' (*Matter of Horton*, 217 N. Y. 363, 368), a proceeding for ancillary administration is directed against assets within the State. The nearest analogy is an attachment, a proceeding *quasi in rem*, where 'only so far as the judgment may be satisfied from such property did it bind the defendant and it imposed no personal obligation upon him.' (*Dimmerling* v. *Andrews*, 236 N. Y. 43.) So in the case of ancillary administration the decree can have no effect except as it may be satisfied by property within the reach of the process of our courts, since 'the constitutional requirement of due process of law precludes the Legislature from providing generally for continuing actions for judgments *in personam* against the foreign executors.' (*McMaster* v. *Gould*, 240 N. Y. 379, 388.) Ancillary administration in this State without assets presently here for administration would be mere *brutum fulmen* [empty threat or noise]. (Cf. *Matthews* v. *Matthews*, 247 N. Y. 32.)" (*Matter of Rogers*, 225 App Div 286, 289, *affd without opn* 254 NY 592; *see also, Leve v Doyle*, 13 Misc 2d 274, *affd without opn* 6 AD2d 1033.)

The factual recitation above makes clear that Obregon's assets were not located in this State at the time of his death and were not brought into this State after his death. The fact that

when Obregon transferred monies to his investment account in London in 1988, he used a New York financial institution (Mellon Bank) to effectuate the transfer and when Morgan Stanley-London transferred the trust assets from London to the Cayman Islands after Obregon's death, it used a cashier's check drawn on another New York financial institution (Citibank, N. A.) cannot serve as the predicate for conferring subject matter jurisdiction. These brief, financial "brushes" with New York did *not* constitute a "location" of Obregon's assets within the State within the meaning of the statute and the case law. Further, property which passes through a New York financial institution used to simply facilitate a transaction beginning in another area of the globe and ending in yet another, is not "located" within this State requiring administration. The provisions of a predecessor statute to the SCPA fixing the jurisdiction of the Surrogate's Court were construed as meaning that the assets must " 'arrive' " or " 'come into' " the State, in good faith, in due course of business, not simply to confer jurisdiction and that " 'Property brought into the State * * * temporarily, after the owner's death, does not confer jurisdiction to grant administration thereon' " (*Hoes v New York, New Haven & Hartford R. R. Co.*, 173 NY 435, 442-443).

Consequently, the assets that briefly "stopped" in New York when Obregon opened his investment account in London and which again were in New York for a brief time when they were transferred from London to the Cayman Islands were not susceptible of marshalling, etc., by the ancillary administrator, and not assets, over which the Surrogate's Court has subject matter jurisdiction, within the purview of SCPA 206 (1). If the rule were otherwise, parties throughout the world-wide economy would hesitate to use New York financial institutions as "clearing" houses for monetary transactions and the existence of New York as a financial capital of the world's economy would be imperiled.

While the Surrogate's Court asserted that a more expansive jurisdiction has been given to it since these earlier cases, acceptance of this postulate does not mean that the Surrogate's Court was granted jurisdiction over a nondomiciliary's assets physically located outside the State. Thus, in *Matter of Piccione* (57 NY2d 278, 287-291), the Court of Appeals, while finding the court had expanded jurisdiction over claims traditionally brought in other courts, did *not* find that the Surrogate's Court was given jurisdiction over the assets of a nondomiciliary located outside the State. This Court, in *Matter of Re v*

*Truck-A-Tune* (191 AD2d 327), simply held that the Surrogate may exercise personal jurisdiction over any nondomiciliary arising from the act of the nondomiciliary within this State.

In fact, while not raised by the parties herein, it would appear that the use of the Mellon account and the Citibank cashier's check in New York would not amount to "minimum contacts" purposeful activity in this State sufficient to subject the Obregon assets to quasi in rem jurisdiction in this State (*see, Rush v Savchuk*, 444 US 320; *Shaffer v Heitner*, 433 US 186).

Since we conclude that the court lacked jurisdiction over the subject matter, we do not reach the issue of forum non conveniens (*Islamic Republic of Iran v Pahlavi*, 62 NY2d 474, 478-479, *cert denied* 469 US 1108).

Accordingly, the order of the Surrogate's Court, New York County (Renee Roth, S.), entered March 12, 1996, which denied the motions by Morgan Stanley Group, Inc. and Barclays Bank PLC to dismiss the ancillary administrator's amended petition on the ground of lack of subject matter jurisdiction, should be reversed, on the law, without costs or disbursements, said motions granted and the amended petition dismissed.

ROSENBERGER, J. P., WALLACH and MAZZARELLI, JJ., concur.

Order, Surrogate's Court, New York County, entered March 12, 1996, reversed, on the law, without costs or disbursements, and the motions to dismiss the ancillary administrator's amended petition on the ground of lack of subject matter jurisdiction granted, and the amended petition dismissed.