# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2944-22

JOHN DOE 1,

    Plaintiff-Appellant,

v.

ARCHDIOCESE OF
PHILADELPHIA,

    Defendant-Respondent.

_____

> Argued April 28, 2025 – Decided June 4, 2025
>
> Before Judges Gummer, Berdote Byrne, and Jacobs.
>
> On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0137-20.
>
> Ruxandra M. Laidacker argued the cause for appellant (Kline & Specter, PC, attorneys; Charles L. Becker, David K. Inscho, Ruxandra M. Laidacker, and Philip M. Pasquarello, on the briefs).
>
> Nicholas M. Centrella argued the cause for respondent (Clark Hill PLC, attorneys; Nicholas M. Centrella, on the briefs).

PER CURIAM

Plaintiff appeals from a Law Division order dismissing his complaint for lack of jurisdiction.  Plaintiff alleges he was repeatedly sexually abused from 1968 to 1970, between the ages of fourteen through sixteen, by Father Francis P. Rogers, a Roman Catholic priest of the Archdiocese of Philadelphia ("the Archdiocese").  Plaintiff maintains that although the abuse occurred mostly in Pennsylvania, he was abused by Rogers on approximately ten occasions in New Jersey.  In the complaint, plaintiff alleges the Archdiocese was civilly liable for Rogers's sexual abuse.  On appeal, plaintiff argues the Archdiocese is subject to specific personal jurisdiction in New Jersey based on the conduct of its agent, Rogers, in New Jersey, and, therefore, the trial court erred in granting the Archdiocese's motion to dismiss for lack of personal jurisdiction.

As recently expressed by our Supreme Court in a similar case, "a priest's exploitation of his clerical role to sexually abuse a minor . . . is reprehensible" however, the "sole issue before [us] . . . is whether our courts may exercise personal jurisdiction over the Archdiocese in the setting of this case."  D.T. v. Archdiocese of Phila., 260 N.J. 27, 33 (2025).  Because the evidence in the record before us reflects the Archdiocese did not purposefully avail itself of any privileges or benefits in New Jersey relating to Rogers's alleged sexual abuse of plaintiff, and the Supreme Court's recent decision in D.T. rejects the notion that

an agency relationship, by itself, may confer personal jurisdiction, we affirm the trial court's order and conclude New Jersey did not have specific personal jurisdiction over the Archdiocese in this matter.

I.

We glean the following facts from plaintiff's complaint and the record developed through extensive jurisdictional discovery. The Archdiocese is a Roman Catholic organization and a non-profit religious corporation authorized to conduct business in Pennsylvania, with its principal place of business located in Philadelphia. The Archdiocese oversees and serves parishes in five Pennsylvania counties. It currently does not have, oversee, or operate any offices, churches, parishes, property, or religious facilities in New Jersey. The Archdiocese does not assign any priests to parishes outside of the five counties it oversees in Pennsylvania. Although it owned several properties in New Jersey in the past, the Archdiocese sold all its New Jersey properties and does not presently own any property in the state.

In 1946, Rogers was ordained and started working with the Archdiocese as a priest. Between his ordination and death, Rogers was assigned to parishes within the Archdiocese. His assignments included Incarnation of Our Lord

Parish ("Incarnation") in Philadelphia, where the Archdiocese placed him from January 1968 to September 1971.

Before Rogers's assignment to Incarnation, the Archdiocese was aware that he had pedophilic tendencies. In 1961, then-Chancellor of the Archdiocese John J. Noone, "wrote a memorandum ('memo') to the file regarding reports of Rogers'[s] [ten]-year history of sexually abusing young boys," wherein he stated he had "received reports from a psychiatrist of Rogers's 'familiarity' with [eighth] and [ninth] grade boys." Noone noted this "'familiar[ity]' with boys" occurred "in at least two other assignments," including Rogers's first parish assignment from 1946 to 1949. The memo also stated Rogers "ha[d] taken boys out of school for trips to the seashore, occasionally overnight ones . . . ." In his memo, Noone concluded "Rogers had committed the acts of which he was accused regarding misconduct with young boys."

The Archbishop of Philadelphia at the time, John J. Krol, added two handwritten notes to the memo: the first note "prescribes an immediate retreat, a '[s]evere warning that any further complaint will call for summary deactivation!' and 'transfer to another post'"; and the second note indicates Krol met with Rogers on May 8, 1961, in response to these allegations, and states "1) [two] week retreat; 2) change; and 3) [c]aveat! Must avoid slightest suspicion—

 A-2944-22

any further complaint will provoke effective action to preclude scandal—even civil." In 1968, Rogers was assigned to Incarnation.

Plaintiff and his family lived in Philadelphia between 1968 and 1970 and were parishioners of Incarnation. According to plaintiff, his parents were devout Catholics, and his mother suggested plaintiff seek out Rogers "for guidance and support regarding a family . . . conflict" when he was fourteen years old. Plaintiff alleged Rogers began to groom him and invited plaintiff to work for Incarnation by counting parish collections in his rectory bedroom.

Rogers took plaintiff to his personally-owned house in Townsend's Inlet, New Jersey, where plaintiff claims Rogers sexually abused him, between 1968 and 1970, approximately ten times. During the same two-year period, Rogers also allegedly sexually abused plaintiff at the Incarnation rectory countless times. In 1970, when plaintiff was sixteen years old, he distanced himself from Rogers. In September 1971, Rogers was transferred out of Incarnation to another parish in the Archdiocese. He retired in 1995 but was never laicized, remaining a priest until his death in 2005.

On April 24, 2020, plaintiff filed the complaint at issue against the Archdiocese, alleging vicarious liability for Rogers's alleged sexual abuse committed in New Jersey, negligence, and negligent supervision, hiring, and

A-2944-22

retention. In response, the Archdiocese moved to dismiss plaintiff's complaint for lack of personal jurisdiction. The trial court adjourned the Archdiocese's motion, consolidated this case with three other cases involving similar claims, and ordered jurisdictional discovery. After jurisdictional discovery was completed, the Archdiocese renewed its motion to dismiss for lack of personal jurisdiction pursuant to Rule 4:6-2(b).

The trial court issued an order granting the Archdiocese's motion to dismiss for lack of personal jurisdiction with prejudice in all four consolidated cases. The trial court found the Archdiocese had minimum contacts with New Jersey and purposefully had availed itself of the benefits and privileges of conducting activities in New Jersey based upon its "ownership of the property [in New Jersey], . . . the annual, regular[,] and sizable retreats held in New Jersey, and the trip by" another priest working for the Archdiocese "with potential priests" in New Jersey.

However, the trial court found there was no relational link between "any of the non-retreat[-]owned properties" and the Archdiocese's retreat center in this case because there were no "allegations that any of the property owned by the [Archdiocese] played any role at all in the sexual abuse of any of the [p]laintiffs"; there were no allegations that a priest was "in New Jersey attending

6

a retreat at the time any of the [p]laintiffs were abused"; and none of the plaintiffs alleged the priests were staying at the retreat center at the time any of the alleged abuse had occurred, or that the abuse occurred at the retreat center.

Plaintiff's appeal followed. After the Supreme Court rendered a decision in D.T., we requested supplemental briefing from the parties regarding whether plaintiff's claims were moot in light of D.T. Plaintiff contends the facts of his case were distinguishable from D.T.

II.

Our review of a trial court's factual findings with respect to jurisdiction is limited to determining whether "those findings are supported by substantial, credible evidence in the record." D.T., 260 N.J. at 41 (quoting Rippon v. Smigel, 449 N.J. Super. 344, 358 (App. Div. 2017)). Nonetheless, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference," and we review those conclusions de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

To determine whether a non-resident defendant may be subject to specific personal jurisdiction, we examine "the relationship among the defendant, the forum, and the litigation." Lebel v. Everglades Marina, Inc., 115 N.J. 317, 323

A-2944-22

(1989) (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).  Pursuant to "Fourteenth Amendment due process principles, a court may exercise specific personal jurisdiction over a nonresident defendant only if there was 'some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities' in the forum state, 'thus invoking the benefits and protections of its laws.'"  D.T., 260 N.J. at 32 (alteration in original) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

Importantly, for specific jurisdiction to attach, a "plaintiff's claims must also 'arise out of or relate to the defendant's contacts with the forum' state."  Ibid. (quoting Bristol-Myers Squibb Co. v. Super. Ct. of Cal., 582 U.S. 255, 262 (2017)); see also Jardim v. Overley, 461 N.J. Super. 367, 376 (App. Div. 2019) ("In order for a state court to exercise [specific] jurisdiction over a nonresident defendant, the lawsuit 'must aris[e] out of or relat[e] to the defendant's contacts with the forum.'" (second and third alterations in original) (quoting Daimler AG v. Bauman, 571 U.S. 117, 127 (2014))).  After determining there to be sufficient minimum contacts, the court must then determine whether maintaining the lawsuit in the forum state "'does not offend "traditional notions of fair play and substantial justice"'" in order to assert personal jurisdiction over the defendant."

D.T., 260 N.J. at 32 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

"The minimum contacts required to establish specific 'jurisdiction often go by the name purposeful availment.'" Id. at 43 (quoting Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021)) (internal quotation marks omitted). "[This] requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." Doe 70 v. Diocese of Metuchen, 477 N.J. Super. 270, 281 (App. Div. 2023) (quoting Lebel, 115 N.J. at 323); see also E.T. v. Boys & Girls Club of Hudson Cnty., 478 N.J. Super. 102, 108 (App. Div. 2024) ("A defendant's conduct must be purposeful and not be caused by the plaintiff's unilateral actions.").

For specific personal jurisdiction to apply, "[t]he defendant 'must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State."'" D.T., 260 N.J. at 43 (second alteration in original) (quoting Ford Motor Co., 592 U.S. at 359). A defendant's contacts must reflect a deliberate decision to reach outside of its home state into the forum state. Ibid.; see also Ford Motor Co., 592 U.S. at 359.

9

Plaintiff claims the Archdiocese purposefully availed itself of the privilege of conducting activities in New Jersey because the record reflects that the Archdiocese, through Archbishop Krol, knew Rogers was taking children on trips "to the seashore"; the Archdiocese was aware Rogers was sexually abusing children on the overnight trips in New Jersey; the trips to New Jersey were "religious retreats" that were "not strictly personal"; and "both [plaintiff] and Rogers understood these trips as within the continuum of Rogers'[s] job and as church outings arising from the relationship between a priest and parishioner."

These contentions are belied by the record, which does not reflect the Archdiocese was aware Rogers was taking any children to his personal home in New Jersey and sexually abusing them there, including plaintiff. Although plaintiff claimed in supplemental briefing "Rogers even would inform the [p]arish pastor when traveling with [plaintiff] to New Jersey," that assertion is not supported by any testimony or documentary evidence. Plaintiff, at his deposition, stated he "d[id not] know" whether Incarnation's pastor "would have known that [he was] going with Father Rogers" to New Jersey. Although "the seashore" is mentioned in the memo, there is no evidence in the record before us the pastor or the Archdiocese was aware that Rogers was taking plaintiff with him on his trips to New Jersey. Nor does the record show Rogers's purpose for

taking these trips with plaintiff was a religious one. Nothing in the record suggests Rogers took plaintiff to a religious site or Archdiocesan-owned property in New Jersey.

The record before us supports plaintiff's allegation Rogers's trips to Townsend's Inlet with plaintiff were taken for the specific purpose of giving Rogers an opportunity to sexually abuse plaintiff. When asked at his deposition "[o]n how many of [the times that Rogers took plaintiff to his Townsend's Inlet house] did he sexually abuse" him, plaintiff replied, "[t]en" and added, "[w]e went there for a purpose." Plaintiff believed Rogers took him to the Townsend's Inlet house "in order to sexually abuse" him, not for any religious reason. There is no evidence the Archdiocese knew of, approved, or sanctioned Rogers's conduct in taking plaintiff to his Townsend's Inlet house.

Although, "[t]he United States Supreme Court has recognized that agency principles may play a role in determining whether a nonresident defendant is subject to specific jurisdiction," our Supreme Court has noted the United States Supreme Court does not "conflate questions of personal jurisdiction with the issue of vicarious liability." D.T., 260 N.J. at 46-47. Therefore, "New Jersey may not exercise specific jurisdiction over the Archdiocese unless the Archdiocese purposefully availed itself of the privilege of conducting activities

in New Jersey," and the claims before us "arose from or related to" those specific contacts with New Jersey. Id. at 47. A plaintiff must establish that the Archdiocese's minimum contacts with New Jersey are relevant to the claims raised by the plaintiff "either directly or through an agent" for agency principles to support the defendant's jurisdictional argument. Ibid. ("Accordingly, if the Archdiocese did not establish minimum contacts with New Jersey that are relevant to this case, either directly or through an agent, agency principles do not support [the plaintiff's] jurisdictional argument.").

Because "determining personal jurisdiction is a separate question from determining vicarious liability," plaintiff cannot claim the Archdiocese is subject to New Jersey's jurisdiction solely because there may be an agency relationship between the Archdiocese and Rogers. D.T. v. Archdiocese of Phila., 477 N.J. Super. 370, 385 (App. Div. 2023), aff'd, 260 N.J. 27 (2025). Our Supreme Court held conclusively "the Archdiocese did not establish such contacts with New Jersey. . . . [T]he Archdiocese's oversight of [defendant-priest's] work as a priest did not give rise to the necessary nexus with New Jersey." D.T., 260 N.J. at 48. Plaintiff cannot rely on the agency relationship to establish specific jurisdiction. Although the trial court found plaintiff had established the Archdiocese's minimum contacts because of its property

12

ownership and its hosting of retreats in New Jersey, none of these contacts were involved in Rogers's alleged sexual abuse of plaintiff. Rogers's sexual abuse of plaintiff did not take place in Archdiocesan-owned property, at an Archdiocesan-held retreat, or with the Archdiocese's prior knowledge or permission. Plaintiff's claims of Rogers's sexual abuse in New Jersey do not "arise out of or relate to the [Archdiocese's] contacts with the forum." Id. at 44 (quoting Ford Motor Co., 592 U.S. at 359) (internal quotation marks omitted). To paraphrase the Supreme Court's sound reasoning in D.T., Rogers, not the Archdiocese, owned the house in which plaintiff was sexually abused; Rogers, not the Archdiocese, elected to take plaintiff to New Jersey; and Rogers, not the Archdiocese, allegedly sexually abused plaintiff. Although the Archdiocese was aware of prior sexual-abuse allegations made against Rogers, there is no evidence in the record to suggest the Archdiocese was aware of Rogers's sexual abuse of plaintiff or any other child in New Jersey.

This case is distinguishable from Doe 70, where one of the defendants, the Catholic Diocese of Richmond, was aware of a priest's sexual abuse of minor parishioners but nonetheless encouraged and allowed the priest to go to New Jersey to serve as a priest and the Diocese "maintained a significant degree of control over [the priest] while he served in New Jersey." 477 N.J. Super. at 276.

Because plaintiff failed to prove his claim "ar[o]se out of or relate[d] to the defendant's contacts with the forum," we affirm the trial court's order dismissing plaintiff's complaint and conclude the Archdiocese is not subject to New Jersey's specific jurisdiction in this matter. D.T., 260 N.J. at 44 (quoting Ford Motor Co., 592 U.S. at 359) (internal quotation marks omitted).

To the extent we have not addressed any of plaintiff's remaining arguments, we are satisfied they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2944-22